16 P.3d 288

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Gerald A. BARCELLA, Defendant–Appellant.**

No. 25216.

Court of Appeals of Idaho.

Sept. 18, 2000.

Review Denied Jan. 17, 2001.

Ronaldo A. Coulter, State Appellate Public Defender; Molly J. Huskey, Deputy Appellate Public Defender, Boise, for appellant. Molly J. Huskey argued.

Hon. Alan G. Lance, Attorney General; Rebekah A. Cudé, Deputy Attorney General, Boise, for respondent. Rebekah A. Cudé argued.

SCHWARTZMAN, Judge.

Gerald A. Barcella was found guilty of the 1995 murder of William Smith. Barcella appeals his conviction for first degree murder, contending that trial errors resulted in the denial of a fair trial. While we find that a number of errors occurred during the trial, we conclude that these errors were, individu-

ally and cumulatively, harmless beyond a reasonable doubt.

## I.

### GENERAL FACTUAL AND PROCEDURAL BACKGROUND

The state's evidence at trial set forth the following fact scenario: On the evening of April 2, 1995, Barcella told Kenneth Thrift—his drinking buddy for the evening, Virginia Smeltzer—the bartender at the Watering Hole bar in Coeur d'Alene, and Brad Bakie that he intended to kill Smith, the elderly manager of the Harmony House apartments where Barcella resided.

Returning to Barcella's room at the Harmony House apartments after the Watering Hole closed, Barcella and Thrift noisily entered the building and went into Barcella's one-room apartment, across the hall from Smith's room. There, they continued to drink accompanied by the noise of the radio and television. Smith, through the door, told Barcella to turn the volume down. Barcella begrudgingly complied. Some time later, while Thrift returned to his room next door to get some cigarettes and more beer, Barcella entered Smith's room and bludgeoned him in the head with a pulaski.[1] When Thrift came back, about five minutes later, Barcella was at Smith's door, across the hall, wiping off the doorknob with his bandana.

Back in Barcella's room, Barcella told Thrift that he had killed Smith. The two continued drinking beer until about 4:30 a.m. and then left to get breakfast at Denny's Restaurant. From there, Barcella called his girlfriend Rikki Bobo. He told her to get over to Denny's and that he had killed Smith. Once she arrived, Barcella again told Bobo and Thrift that he killed Smith by striking him in the head three times with a pick ax.

After visiting with Barcella and Thrift at Denny's for nearly an hour, Bobo returned to Barcella's room at Harmony House. There, she noticed that Barcella's pulaski was not in his room. When Barcella arrived, Bobo, with Barcella's approval, wrote out a note ad-

---

1. A pulaski is a single bit axe with an adze shaped hoe blade extending from the back. Webster's Third New International Dictionary 1839 (1993).

dressed to Smith requesting a receipt for Barcella's rent payment. Barcella told her that the note was a good idea because it would make the police believe that Barcella thought Smith was still alive. Bobo slipped the note under Smith's door.

Later that afternoon, Peter Cooper, the owner of the Harmony House apartments, discovered Smith's body. Smith had several large head wounds and smaller wounds in his chest. A pulaski was found under a piece of carpet stuffed under Smith's bed. During the homicide investigation, officers discovered that Barcella, a convicted felon, possessed firearms in his room. While in jail on a charge of being a felon in possession of a firearm, Barcella was charged with first degree murder for the killing of Smith, I.C. §§ 18–4001—18–4003.

At the preliminary hearing, Robert Agrifolio, a convicted defendant in an unrelated burglary case, testified that in September of 1995 he occupied a jail cell adjacent to Barcella's cell in the Latah County Jail. After identifying Barcella, Agrifolio testified that, while in the jail's recreation yard, Barcella told him he hit Smith in the head with an ax because he believed Smith had killed his puppy. Agrifolio was cross-examined extensively about his prior convictions, his conversations with Barcella, and his reason for testifying. Agrifolio testified that he was under subpoena and denied being a jailhouse snitch or getting any benefit from testifying against Barcella.

Barcella was bound over to district court for trial on the charge of murder in the first degree. At trial, the state called twenty-two witnesses including investigating officers, medical experts, the Watering Hole bartender, the apartment owner, several apartment residents, Bobo, Thrift and two jailhouse informants—Agrifolio and George Lane.

Before calling Thrift, the state attempted to preclude impeachment through Thrift's prior criminal convictions. In part, Barcella sought to impeach Thrift by introducing evidence of his criminal history, arguing that Thrift is per se untruthful because honest people do not get arrested ninety-four times, forty-two of which were for felonies. The trial court ruled that Thrift's only felony

convictions in the last ten years were two DUIs, not crimes relevant to truth and veracity under I.R.E. 609. Thrift testified that Barcella owned a pulaski when he moved into the Harmony House apartments, that Barcella had several times threatened to kill Smith, and that he had seen Barcella wiping off Smith's doorknob with a bandana when Thrift came out of his room with more beer. Thrift also stated that Barcella admitted to killing Smith once he and Thrift returned to Barcella's room to drink more beer and, again, after he and Thrift arrived at Denny's Restaurant for breakfast early the next morning.

Bobo also testified that Barcella owned a pulaski when he moved into the Harmony House apartments. She further testified to Barcella's admissions to killing Smith and acknowledged that she had written a note about rent payment that was slipped under Smith's door to prevent police attention from focusing on Barcella. After challenging Bobo's credibility by questioning her about a plea deal on a recent DUI charge and the state's grant of immunity regarding her writing the rent payment note, Barcella also sought to inquire about her status as a jail inmate and why she was allowed to testify in civilian clothing and makeup. The court sustained the state's objection to this line of inquiry.

The state then attempted to call Agrifolio as its next witness; however, the bailiff reported that Agrifolio had told the jailers that he refused to testify. Agrifolio was brought into court from the jail and questioned. After he indicated that he did not want to testify, the court appointed counsel for Agrifolio so that he could obtain legal advice before finally deciding whether or not to testify. A day later, Agrifolio's counsel informed the court that Agrifolio would not testify. The district court determined that Agrifolio was unavailable. Four days later, the court, over Barcella's objection, permitted Agrifolio's preliminary hearing testimony to be read into the record.

The state's twentieth witness, Lane, also a jailhouse witness, testified that Barcella had admitted to killing his apartment manager by

hitting him in the back of the head because the manager was nagging him about making too much noise. Lane testified that Barcella said a witness, his drinking buddy, had seen him come out of the manager's apartment on the night of the murder. Lane testified that Barcella was not worried about being prosecuted because in the past he had shot a couple of people and was never convicted. Barcella immediately objected and moved for a mistrial on the grounds that the state has elicited testimony about prior bad acts in violation of I.R.E. 404. The district court denied the motion for a mistrial and instructed the jury to disregard Lane's last statement.

Barcella also sought a mistrial on the ground that the state made a late disclosure of the first twenty-seven pages of the transcript of Bobo's statement to the police. The court denied the motion, suggesting Barcella could avoid any prejudice caused by late disclosure by recalling Bobo as a witness. Barcella declined to do so.

The trial court denied Barcella's motion for a judgment of acquittal made at the close of the state's case. During Barcella's case-in-chief, Barcella did not testify. After presenting several character witnesses in defense, Barcella sought to introduce testimony from Kootenai County Public Defender's Office Investigator Mark Durant. Durant was to testify that Agrifolio had recently made several unsolicited telephone calls to him, stating that he—Agrifolio—had been pressured into testifying at the preliminary hearing and, that when asked if his preliminary hearing testimony had been truthful, Agrifolio had said he would "take the Fifth Amendment on that." The state objected and the court, without explanation, disallowed Durant's testimony.

The jury returned a verdict of guilty to first degree murder and found that Barcella had used a deadly weapon in the commission of the murder. Barcella filed a motion for new trial re-raising the issues he had raised at trial—Lane's blurt about Barcella having shot two people in the past and gotten away with it, the late disclosure of the first twenty-seven pages of Bobo's statement to the police, the admission of Agrifolio's preliminary

hearing testimony, the trial court's preclusion of Durant's impeachment of Agrifolio's preliminary hearing testimony, and the court's refusal to allow Barcella to inquire into Thrift's record of prior arrests to impeach him for lack of truthfulness. The district court denied Barcella's motion for a new trial, explaining that Barcella had failed to demonstrate prejudice from the state's late disclosure of a portion of Bobo's statement to the police and that Lane's "couple of shootings" blurt had been dealt with by instructing the jury to disregard that statement. The court also ruled that Agrifolio's purported refusal to testify made him unavailable, allowing his preliminary hearing testimony to be read into the record, that I.R.E. 609 did not permit Barcella to impeach Thrift with his prior arrests, and that Barcella had made no offer of proof regarding impeachment of Agrifolio's preliminary hearing testimony.

The state filed a notice of intent to seek the death penalty, and a hearing was held on aggravating and mitigating circumstances. The district court found that the state had failed to prove the existence of any statutory aggravating circumstance beyond a reasonable doubt and thus the death penalty could not be imposed. At sentencing, the district court imposed a term of life imprisonment, with thirty years fixed. The court denied Barcella's I.C.R. 35 motion for reduction of the sentence. Barcella appeals.

## II.

### GENERAL STANDARD OF REVIEW

■ In this appeal, we must first determine whether the trial errors alleged by Barcella are actual errors; and second, whether any such errors, singularly or cumulatively, require the judgment of conviction to be vacated. An error or defect in a criminal trial that does not affect the defendant's substantial rights will not necessitate a new trial. I.C.R. 52; *State v. Pizzuto*, 119 Idaho 742, 753, 810 P.2d 680, 691 (1991) *overruled on other grounds State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991). Accordingly, convictions will not be set aside for errors or defects that have little, if any, likelihood of having changed the results of the trial.

*Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 826, 17 L.Ed.2d 705, 709 (1967); *State v. Garcia*, 100 Idaho 108, 111, 594 P.2d 146, 149 (1979); *State v. Reynolds*, 120 Idaho 445, 451 n. 5, 816 P.2d 1002, 1008 n. 5 (Ct. App.1991).

■ "The test for harmless error ... is whether a reviewing court can find beyond a reasonable doubt that the jury would have reached the same result without the admission of the challenged evidence." *State v. Moore*, 131 Idaho 814, 821, 965 P.2d 174, 181 (1998); *Giles v. State*, 125 Idaho 921, 925, 877 P.2d 365, 369 (1994). Where an error concerns evidence omitted at trial, the test for harmless error is whether there is a reasonable possibility that the lack of excluded evidence contributed to the verdict. *State v. Harris*, 132 Idaho 843, 847, 979 P.2d 1201, 1205 (1999).

### III.

### THE DISTRICT COURT'S DENIAL OF BARCELLA'S MOTION FOR A MISTRIAL IMMEDIATELY FOLLOWING LANE'S BLURT ABOUT BARCELLA HAVING COMMITTED A COUPLE OF SHOOTINGS IN THE PAST AND REGARDING THE LATE DISCLOSURE OF THE FIRST TWENTY–SEVEN PAGES OF BOBO'S STATEMENT TO THE POLICE

### A. Standard Of Review

■ In criminal cases, motions for mistrial are governed by I.C.R. 29.1, which provides in part that "[a] mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial." Our standard for review of a refusal to grant a mistrial is well established:

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for

mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the 'abuse of discretion' standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Shepherd*, 124 Idaho 54, 57, 855 P.2d 891, 894 (Ct.App.1993) (citing *State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct.App.1983)). *See also State v. Guinn*, 114 Idaho 30, 752 P.2d 632 (Ct.App.1988); *State v. Stoddard*, 105 Idaho 169, 667 P.2d 272 (Ct.App.1983). "[The] error will be deemed harmless if the appellate court is able to declare, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of contributed to the conviction." *Shepherd*, 124 Idaho at 58, 855 P.2d at 895 (citing *State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981)).

### B. Lane's Blurt About Barcella Having Committed Two Prior Shootings

Lane testified that he shared a pod (a group of cells) with Barcella in the Kootenai County Jail in January or February of 1997. Lane said that Barcella told him he had killed "an older guy, a manager of an apartment building" and that the victim irritated Barcella by complaining about the volume of his radio and television. Lane testified that Barcella told him a drinking partner had been around at the time he hit the victim, but Lane could not recall the drinking partner's name. When asked whether Barcella had said the drinking partner had seen Barcella in the area of the victim's room, Lane said, "Yeah, that he was the only party he was worried about." Then, the prosecutor asked, "Did the defendant ever tell you whether he believed he was going to be convicted or not?" Lane answered that Barcella said he would not be. When asked why, Lane said, *"Probably because he had had a couple other shootings under his belt and he was never convicted."*

Barcella immediately objected and asked, outside the presence of the jury, for a mistrial on the ground that the state had elicited in front of the jury a confession from the defendant that he had twice shot somebody and had gotten away with it—evidence of prior bad acts prohibited by I.R.E. 404. Barcella argued that the state had possessed a transcript of Lane's testimony for a long time, had spoken with Lane and his attorney and knew about the two prior shootings statement, but did absolutely nothing to prevent it from coming in, and that there was no way to unring the bell in the jurors' heads. The prosecutor asserted the information was not knowingly adduced and that the expected answer was that Barcella had said, "Nobody could prove that I was in that apartment," an answer that appears in the transcript of Lane's police interview. The prosecutor admitted that he prepared his questions from the transcript of Lane's statement, which included Lane's comment that Barcella said he "[had] shot a couple of people two other times," but not that he had gotten away with it. The prosecutor stated that a copy of the transcript was delivered to Lane and that Lane was told that he would be asked questions directly from it. However, he did not advise Lane about what Lane could or could not talk about because he did not want to give the appearance of coaching Lane. After a recess, the court noted that the defense opening statement had already informed the jury they would hear that Barcella was arrested several days after Smith's murder because he had guns in his room and had previously been convicted of a felony. The court then denied the motion for a mistrial, explaining:

Now, I recognize that the defendant's contention or argument in support of the motion for mistrial is that the last few words uttered by the witness Lane just prior to the objection were . . . gratuitously made. I recognize the defendant's concern, and I had some concern, . . . that the state should have taken perhaps more steps to caution witnesses as to the areas that they should eschew that they should avoid bringing to the attention of the jury.

Here, in summary, the jurors anticipated . . . based on defense counsel's opening statement, that they would hear some bad things about the defendant's prior conduct. And it should come as no surprise to them.

Now, I've weighed the effect of that statement of Mr. Lane made, against all the circumstances in this case and in particular the defendant's anticipation and statement to the jury that they are going to hear some bad things about the defendant.

The best I can do is admonish the jurors they cannot find the defendant guilty merely because of prior acts on his part that were less than savory. And I certainly will make that very strong in final instructions to the jury.

The motion for mistrial is denied.

The court then admonished the jury not to consider Lane's last answer as evidence and instructed them to "totally disregard it." The district court later denied Barcella's motion for new trial or judgment of acquittal, explaining that it had both admonished the jury to disregard Lane's "couple of shootings" statement and formally instructed the jury to disregard the statement.

■ On appeal, the state *concedes* that Lane's two prior shootings statement was not properly admissible, but argues that its interjection into the trial was harmless error. The right to due process does not guarantee a defendant an error-free trial, but a fair one. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Idaho Rule of Evidence 404(b) prohibits the admission of evidence of other crimes or wrongs for the purpose of showing a person's character or propensity to commit crimes. *State v. Vierra*, 125 Idaho 465, 471, 872 P.2d 728, 734 (Ct.App.1994); *Guinn*, 114 Idaho at 34, 752 P.2d at 636. When a motion for mistrial is made, the question is "whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record," i.e., whether Lane's blurt contributed to the verdict in light of all the other evidence. *Shepherd*, 124 Idaho at 57, 855 P.2d at 894; *Guinn*, 114 Idaho at 34–35, 752 P.2d at 636–37.

■ Although the interjection of the "couple other shootings" statement was plainly

improper, we conclude that it was harmless beyond a reasonable doubt.[2] Lane was the state's twentieth witness. Prior to his testimony, the jury had been told by the defense that Barcella had a prior felony conviction. The jury heard testimony from bartender Smeltzer, bar patron Bakie,[3] and Thrift that Barcella had told them he intended to kill Smith. The jury also heard testimony from Thrift, Bobo and Lane that Barcella admitted to killing Smith. Thrift and Bobo both testified that Barcella owned a pulaski. Thrift also testified that he saw Barcella wiping off Smith's doorknob with a bandana when Thrift came out of his room the night Smith was killed. Bobo testified that the pulaski was missing from Barcella's room the next day. A pulaski was recovered from under the bed in Smith's room.

■ As previously noted, an error will be deemed harmless if the appellate court is able to declare, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of contributed to the conviction. *See also State v. LePage*, 102 Idaho 387, 393, 630 P.2d 674, 680 (1981); *State v. Rupp*, 118 Idaho 17, 19, 794 P.2d 287, 289 (Ct.App.1990). We are convinced, beyond a reasonable doubt, that even if Lane's blurt about prior shootings had not been heard by the jury, the remaining evidence would have easily led the jury to return a guilty verdict. *Shepherd*, 124 Idaho at 57, 855 P.2d at 894; *Guinn*, 114 Idaho at 34–35, 752 P.2d at 636–37. Given the totality of admissible evidence, and when viewed in context of the full record, Lane's blurt did not contribute to Barcella's conviction. Accordingly, the district court correctly denied Barcella's motion for mistrial. Additionally, the district court properly denied Barcella's motion for a new trial as to this ground.

## C. The Late Disclosure Of The First Twenty–Seven Pages Of Bobo's Statement To The Police

■ Where the late disclosure of evidence forms the basis of an alleged due process violation, the defendant must show the late disclosure to have been so prejudicial to the defendant's preparation of his or her case that a fair trial was denied. *State v. Tapia*, 127 Idaho 249, 255, 899 P.2d 959, 965 (1995); *State v. Canelo*, 129 Idaho 386, 389, 924 P.2d 1230, 1233 (Ct.App.1996). To prove prejudice, a defendant must show there is a reasonable probability that, but for the late disclosure of evidence, the result of the proceeding would have been different. *Tapia*, 127 Idaho at 255, 899 P.2d at 965.

■ After Bobo had testified, the state found and disclosed to the defense the first twenty-seven pages of a transcribed taped statement Bobo had made to the police. Barcella made a motion for mistrial on this ground, arguing that "for the state to give us twenty-seven pages of a transcript between their main witness and police directly related to this crime, after the witness has testified and five days into trial, is fundamentally prejudicial." The state responded that a copy of all the tapes had been copied for the defense long before trial. Barcella maintained that his discovery request included all tapes and that he never received the tape from which the transcript was made.

The trial court reviewed the twenty-seven page transcript and thereafter stated:

> Maybe [the company that copied the tapes] didn't give them the tape. The only way to solve this, and I think it's got to be resolved to afford the defendant the opportunity to further examine Ms. Bobo. I will deny a mistrial. I will just explain to the jurors that Ms. Bobo is going to be further cross-examined, and then based on whatever her testimony is, you will have the opportunity . . . to examine her then.

Rather than calling Bobo as a witness, Barcella requested leave to enter into a stipulation with the state to read into evidence the fact that Bobo told the police that when she got to Denny's Restaurant the waitress picked up Barcella's plate at 7 a.m. The court granted Barcella's request, and pursuant to the stipulation, informed the jury that:

---

**2.** We do not interpret Lane's blurt as meaning that Barcella was guilty of two previous *murders*.

**3.** Bakie testified that he heard Barcella threaten to kill Smith ten times on the evening of April 2, 1995.

"When Rikki Bobo arrived at Denny's on the morning of April 3, 1995, Gerald Barcella and Kenneth Thrift were eating and a waitress took their plates around 7 [a.m.]. That is an established fact in this case."

Assuming, without deciding, that the state did commit a discovery violation, Barcella has failed to show how he was prejudiced by this violation. The defense was afforded the opportunity to re-examine Bobo. Any information the defense wished to bring out was available on re-examination of Bobo in front of the jury. The defense declined to do so and instead availed itself of the opportunity to present the above stipulation to the jury. Given that Barcella did not recall Bobo as a witness and only elected to offer the above stipulation, Barcella has failed to establish that, but for the late disclosure of the twenty-seven page transcript, there was a reasonable probability that the result of the trial would have been different. I.C.R. 16; *Tapia*, 127 Idaho at 255, 899 P.2d at 965; *Canelo*, 129 Idaho at 389, 924 P.2d at 1233. Thus, any discovery violation by the state was harmless.[4] *State v. Marek*, 112 Idaho 860, 868, 736 P.2d 1314, 1322 (1987) (lack of showing prejudice from failure to comply with discovery request rendered error, if any, harmless); *State v. Cochran*, 129 Idaho 944, 949–50, 935 P.2d 207, 212–13 (Ct.App.1997). Additionally, the district court properly denied Barcella's motion for a new trial as to this ground.

## IV.

### EVIDENTIARY RULINGS REGARDING LIMITATIONS ON CROSS–EXAMINATION OF BOBO AND THRIFT

The "[c]ontrol of cross-examination of a witness is committed to the sound discretion of the trial judge, and absent a showing of prejudice, a limitation of cross-examination imposed by a trial judge will not be overturned on appeal." *Marek*, 112 Idaho at 867, 736 P.2d at 1321; *State v. Pierce*, 107 Idaho 96, 104, 685 P.2d 837, 845 (Ct.App.1984).

Before Bobo was called to the stand and sworn, the state moved to prohibit the defense from inquiring into the fact that Bobo was in jail. The state represented that she had been arrested the day before on two misdemeanor warrants in Kootenai County and one misdemeanor warrant from Shoshone County, all for failures to appear and/or pay fines. Barcella sought to challenge Bobo's veracity by eliciting evidence that she was residing at the jail. He argued that, to prevent a misrepresentation to the jury, he should be allowed to elicit testimony showing that she was in jail and that the prosecutor let her put on civilian clothes even though the jail did not allow such. The state objected to the defense's proposed inquiry. The court rejected Barcella's offer of proof on that point as not relevant to truth and veracity.

Bobo then testified to Barcella's admissions of murder and his ownership of a pulaski when he moved into the Harmony House apartments. Barcella fully cross-examined Bobo on an immunity agreement regarding a possible accessory charge and Bobo's recent DUI, reduced from a felony to a misdemeanor because one of her prior convictions was not constitutionally valid. However, Barcella was not allowed to inquire into her residence at the jail and ask why she was allowed to testify in civilian clothing and makeup.

As stated in *State v. Araiza*, 124 Idaho 82, 91, 856 P.2d 872, 881 (1993), exposure of the witness's motivation in testifying is always a proper and important function of the constitutionally protected right of cross-examination. However, the mere fact that Bobo was in jail and allowed to testify in civilian clothes was, at best, only marginally relevant and well within the trial court's discretion to control under I.R.E. 403. A trial court may reasonably limit cross-examination that is marginally relevant. *Id.* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986)). This is especially true where, as here, Barcella was extended considerable latitude in exploring Bobo's possible bias and motive. Ac-

---

**4.** Barcella has failed to include pages one through twenty-seven of the Bobo statement

transcript in the appellate record.

cordingly, we conclude that the court did not abuse its discretion in this regard.

■ Barcella also sought to impeach Thrift with his prior record of ninety-four arrests, arguing that he was per se untruthful because an honest person would not have that many arrests for serious crimes. The court asked if Barcella sought to attack Thrift's character under I.R.E. 609, which permits impeachment by evidence of a prior felony conviction where the nature of the conviction is relevant to truthfulness and the conviction is not more than ten years old. ·Counsel for Barcella asserted that there were other rules under which Thrift's credibility could be impeached. When asked what character evidence would be offered, counsel said "[t]hat he has been arrested ninety-four times, including forty-two felonies." Thereafter, the court ruled that Thrift had only two felony convictions within the last ten years, both DUI's, that neither was indicative of lack of credibility, and that neither had probative value.

The district court's ruling was consistent with I.R.E. 609(a), which prohibits the admission of prior convictions that are not relevant to credibility. Furthermore, while I.R.E. 609(b) allows the use of prior convictions over ten years old upon adequate prior notice to the opposing party, Barcella provided no such notice. Accordingly, we conclude that the trial court did not improperly restrict the cross-examination of Thrift.

## V.

## ADMISSION OF AGRIFOLIO'S PRELIMINARY HEARING TESTIMONY AND THE EXCLUSION OF DURANT'S IMPEACHMENT TESTIMONY

### A. The Trial Court's Ruling That Agrifolio Was An Unavailable Witness

■ Idaho Rule of Evidence 804(a) defines unavailability for purposes of determining the admissibility of former testimony under I.R.E. 804(b)(1) and Idaho Code § 9–336. Rule 804(a) states in pertinent part:

(a) Definition of Unavailability. "Unavailability as a witness" includes situations in which the declarant:

(2) persists in refusing to testify concerning the subject matter of declarant's statement despite an order of the court to do so;

Where a witness maintains his refusal to testify in spite of appropriate judicial pressure, he or she is unavailable. *State v. Hoak,* 107 Idaho 742, 746, 692 P.2d 1174, 1178 (1984) (witness unavailable where ordered to testify, refused to do so and held in contempt). *See also State v. Mee,* 102 Idaho 474, 480, 632 P.2d 663, 669 (1981).

Idaho Rule of Evidence 804(a)(2) and F.R.E. 804(a)(2) use exactly the same language. As Professors Mueller and Kirkpatrick explain:

A declarant is unavailable under FRE 804(a)(2) if he "persists in refusing to testify concerning the subject matter" of his statement despite a court order to do so. Typically such unavailability appears when the court overrules a privilege claim and tells the witness to answer but he refuses. Sometimes witnesses refuse without giving reasons, most often in criminal cases where the prosecutor wants their testimony and witnesses are afraid of the defendant, or reluctant to send friends to jail, or to be involved in the effort to punish.

Obviously showing this kind of unavailability involves calling the declarant, putting questions that elicit his refusal to answer, and then getting a court order directing him to testify. Representing that he will not testify is usually not enough, although a clear and careful statement refusing to cooperate is sometimes sufficient, and a mere claim of privilege is not the same as refusing to testify. Clearly the rule contemplates a refusal to testify despite judicial pressure. Usually it is appropriate for the judge to tell the witness that continued refusal will put him in contempt and subject him to incarceration or other punishment, since such warnings test the refusal and show an effort to obtain live testimony.

CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE § 8.53, at 1002–03 (1995). The Advisory Committee notes to subsection (a)(2) of I.R.E. 804 reflect the intent behind

the rule—that the witness's testimony will be deemed unavailable if the court orders the witness to testify and he or she persists in refusing to do so in violation of that order:

> [I]f the declarant persists in refusing to testify regarding the subject matter of his statement despite an order to so testify, he is considered unavailable. This situation could arise when the witness refuses to testify under an improper claim of privilege. If the court thereby orders the witness to testify and he persists in refusing, the witness will then be considered unavailable for the purpose of this rule.

REPORT OF IDAHO STATE BAR EVIDENCE COMMITTEE § C 804, p. 2 (1985). A similar intent is expressed in the Advisory Committee Note to the federal rule.

■ As previously noted, Agrifolio was brought into court and questioned about his purported refusal to testify. In response to the court's inquiry, Agrifolio said that he did not have a reason for refusing to testify, only that he did not want to have anything to do with the case against Barcella. When the court asked if Agrifolio believed that his testimony might lead to a perjury or other criminal charge, he answered, "No." Agrifolio was then placed under oath and questioned by the state. He testified that he had "pretty much made up [his] mind" not to testify because he was fearful of retribution for being a snitch. When counsel for Barcella asked if he wanted a lawyer, Agrifolio responded "Yes, ... I feel the need to explore my options." The court appointed counsel and Agrifolio was then returned to the jail.

The next day, counsel for Agrifolio appeared in court, *without* his client, and explained that Agrifolio would not testify under the present circumstances—notwithstanding his status as a state prisoner, the court's power to the extent that it could be exerted on him, and the possibility his preliminary hearing testimony might be used against Barcella if he refused to testify. The state did not request and the court did not order Agrifolio back into court for a first-hand inquiry into his purported refusal to testify. Instead, over Barcella's objection, the district court ruled that Agrifolio's apparent decision not to testify rendered him unavailable under

I.R.E. 804(a)(2) and that his prior testimony at the preliminary hearing would be admissible hearsay under I.R.E. 804(b)(1). Moreover, the state did not immediately move for admission of Agrifolio's preliminary hearing testimony, opting to wait until after the presentation of its other witnesses.

*Four days later,* the state sought to use Agrifolio's preliminary hearing testimony as evidence against Barcella. Again, the state did not request that Agrifolio be brought into court for further inquiry and ordered to testify. Likewise, the district court did not test Agrifolio's resolve by ordering him to testify under the immediate threat of contempt.

An essential component in a declaration of unavailability under 804(a)(2) is an order from the court directing the witness to testify at the time the proponent of the testimony seeks to have that testimony admitted. *See, e.g., United States v. Doerr,* 886 F.2d 944, 953–55 (7th Cir.1989) (Court's determination that witness was unavailable four days after witness's refusal to testify despite order to do so and finding of civil contempt was improper. The court's failure to inquire as to whether the witness was still recalcitrant at the time the state sought to offer the witness's grand jury testimony was error.); *United States v. Oliver,* 626 F.2d 254, 261 (2nd Cir.1980) (Faced with a witness who still refused to testify after his assertion of a Fifth Amendment privilege was properly denied, the court should have ordered the witness to testify outside the presence of the jury and warned that the continued refusal to testify despite the court's order would be punishable by contempt.). As set forth above, Agrifolio was not brought back before the court on the day the state sought to use his testimony, and so the court never tested his purported refusal to testify at that time by ordering him to testify under the immediate threat of contempt. "[I]t is always possible that a recalcitrant witness who does not respond to judicial pressure will testify when ordered to do so rather than face contempt proceedings for refusal to obey the court's order." *Oliver,* 626 F.2d at 261. This choice was never put to Agrifolio.

Accordingly, we hold that the trial court erred in ruling that Agrifolio was in fact an

unavailable witness without first bringing him back into court and ordering him to testify under the direct threat of contempt.[5] Agrifolio was not an unavailable witness as defined by I.R.E. 804(a)(2) and the admission of his preliminary hearing testimony was error.

## B. The Trial Court's Exclusion Of Agrifolio's Subsequent Inconsistent Statements

Barcella argues that once Agrifolio's preliminary hearing testimony was admitted, the district court denied him a fair trial by precluding him from establishing Agrifolio's bias and motive through the testimony of investigator Durant.

 After the district court had admitted Agrifolio's preliminary hearing testimony, Barcella sought, in an offer of proof, to introduce testimony from Durant that Agrifolio had voluntarily telephoned the Public Defender's Office and told Durant that he felt that he was being pressured and threatened with harder prison time to force him to testify. Durant would also testify that when he asked Agrifolio if his preliminary hearing testimony was truthful, Agrifolio said he would "take the Fifth Amendment on that," which indicated to Durant that Agrifolio's prior testimony had not been truthful. Durant's statements were set forth in an affidavit asserting that the phone conversations with Agrifolio were recorded. Barcella argued that what he wanted to present was evidence that Agrifolio had not been truthful in his prior testimony. Sustaining the state's objection, the court, without explanation, refused to allow Durant to testify.

Idaho Rule of Evidence 806 provides:
ATTACKING AND SUPPORTING CREDIBILITY OF DECLARANT.

When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with

declarant's hearsay statement, is not subject to any requirement that declarant may have been afforded an opportunity to deny or explain.

See also D. CRAIG LEWIS, IDAHO TRIAL HANDBOOK § 19.9, at 228–29 (1995) (When impeachment is done through the use of inconsistent statements, I.R.E. 806 exempts such impeachment from the requirement that the declarant have an opportunity to explain or deny the statement.). Although Durant would not have been able to testify to what he thought Agrifolio meant by "taking the Fifth," as opposed to letting the jury make the determination, Agrifolio's unsolicited statements to the public defender investigator regarding alleged prosecutorial pressures to secure his testimony goes directly to motive, interest and bias. As stated in *Delaware v. Van Arsdall*, 475 U.S. 673, 679–80, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986) and *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974), exposure of the witness's motivation in testifying is always a proper and important function of the constitutionally protected right of cross-examination.

Accordingly, we hold that the trial court erred in excluding Durant's impeachment testimony of Agrifolio's preliminary hearing transcript. *Araiza*, 124 Idaho at 91, 856 P.2d at 881; *State v. Kenner*, 121 Idaho 594, 597, 826 P.2d 1306, 1309 (1992).

## C. Harmless Error

 Nevertheless, from our review of the entire record, Agrifolio's preliminary hearing testimony added little more than a small amount of weight to the massive quantity of evidence of Barcella's guilt that was already before the jury. His testimony, which included extensive cross-examination, contained a few additional details about how Barcella allegedly killed Smith. However, its effect was almost entirely corroborative of testimony given by previous witnesses. Thus upon the record before us we conclude, beyond a reasonable doubt, that the erroneous admission of Agrifolio's preliminary hearing transcript did not contribute to the convic-

---

5. We would otherwise rule Agrifolio's testimony to have met the requirements of I.R.E. 804(b)(1).

**204**

tion, because the jury would have convicted Barcella regardless. *See State v. Cross,* 132 Idaho 667, 669–70, 978 P.2d 227, 229–30 (1999). We further conclude that there is no reasonable possibility that the erroneous exclusion of Durant's proffered testimony about Agrifolio's subsequent statements contributed to the verdict. Accordingly, the errors were harmless beyond a reasonable doubt. Barcella was not entitled to a new trial on this basis.

## VI.

### CUMULATIVE ERROR

 As we recently explained in *State v. Lovelass,* 133 Idaho 160, 171, 983 P.2d 233, 244 (Ct.App.1999):

The doctrine of cumulative error is predicated on the finding of error in the first instance. *State v. Medina,* 128 Idaho 19, 29, 909 P.2d 637, 647 (Ct.App.1996). Although individual errors may be deemed harmless, 'an accumulation of such errors may deprive a defendant of a fair trial.' [citations omitted].

In order to find cumulative error, this Court must first conclude that there is merit to more than one error alleged by Barcella and then conclude that these errors, when aggregated, denied Barcella a fair trial. *See State v. Gray,* 129 Idaho 784, 804, 932 P.2d 907, 927 (Ct.App.1997) (defining cumulative error as an accumulation of errors which may be harmless individually but in the aggregate operate to deny the defendant a fair trial in violation of the defendant's constitutional right to due process).

 The material errors in this case were Lane's blurt about two prior shootings, the admission of Agrifolio's preliminary hearing transcript based upon unavailability, and the exclusion of Durant's testimony concerning Agrifolio's unsolicited phone calls to impeach his preliminary hearing testimony. As set forth above, analysis of these three errors, in light of the full record, leads to the conclusion that, even without the erroneously admitted evidence, there is overwhelming evidence of Barcella's guilt. Thus, we are confident, beyond a reasonable doubt, that the cumulative effect of these errors did not con-

tribute to Barcella's conviction or otherwise affect his substantial rights. The jury would have reached the same result regardless. Accordingly, we reject Barcella's cumulative error claim.

## VII.

### SENTENCE REVIEW

 Where a sentence is within the statutory limits, the appellant bears the burden of demonstrating that it is a clear abuse of discretion. *State v. Hedger,* 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989). A sentence may constitute a clear abuse of discretion if it is unreasonable upon the facts of the case. *State v. Broadhead,* 120 Idaho 141, 145, 814 P.2d 401, 405 (1991), *overruled on other grounds by State v. Brown,* 121 Idaho 385, 825 P.2d 482 (1992).

[A] term of confinement is reasonable to the extent it appears necessary, at the time of sentencing, to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case. A sentence of confinement longer than necessary for these purposes is unreasonable.

Such determinations cannot be made with precision. In deference to the discretionary authority vested in Idaho's trial courts, we will not substitute our view for that of a sentencing judge where reasonable minds might differ. An appellant must show that, under any reasonable view of the facts, his sentence was excessive in light of the foregoing criteria.

*Broadhead,* 120 Idaho at 145, 814 P.2d at 405, quoting *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). Where an appellant asserts that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record and focus upon the nature of the offense and the character of the offender. *State v. Hernandez,* 121 Idaho 114, 118, 822 P.2d 1011, 1015 (Ct.App.1991); *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). With respect to sentences imposed under the Uniform Sentencing Act:

the minimum period [of confinement] generally will be treated as the probable measure of confinement for the purpose of sentence review. By focusing on this period, we do not wholly disregard the aggregate length of the sentence, nor do we suggest that a prisoner will be *entitled* to parole when the minimum period has elapsed; but we do recognize that he will be *eligible* for parole at that time.

*State v. Sanchez,* 115 Idaho 776, 777, 769 P.2d 1148, 1149 (Ct.App.1989).

Barcella, thirty-eight years old at the time of sentencing, argues that the fixed thirty-year portion of his sentence should be reduced to allow Barcella the opportunity to be rehabilitated. Barcella must demonstrate that this thirty-year period was an abuse of the district court's discretion. Barcella's criminal record contains twenty-one instances of violence against others, including assaults, breach of the peace, bar fights and malicious injury to property, spanning a period of twenty-one years. The instant offense was the brutal murder of an elderly frail man. Barcella's reasons for killing him were senseless. He was irritated at Smith for nagging him about being noisy and offensive. The trial court, after a formal hearing in consideration of the death penalty, concluded that the state had failed to prove any statutory aggravating factor beyond a reasonable doubt. Nevertheless, protection of society required a substantial sentence. Therefore, the court imposed a life sentence, with thirty years fixed. We cannot say that the district court abused its discretion in imposing this sentence.

## VIII.

### CONCLUSION

As set forth above, although we find error in the admission of Agrifolio's preliminary hearing testimony, in the denial of Barcella's opportunity to challenge the veracity of Agrifolio's testimony, and in Lane's blurt about two prior shootings, these errors, both individually and cumulatively, were harmless. Additionally, the district court did not abuse its discretion in sentencing Barcella to life imprisonment, with thirty years fixed, for

first degree murder. Accordingly, Barcella's conviction and sentence are affirmed.

Judge LANSING and Judge Pro Tem SCHILLING concur.