# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 47557

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) Filed: February 2, 2021 |
| Plaintiff-Respondent, | ) |
| | ) Melanie Gagnepain, Clerk |
| v. | ) |
| | ) THIS IS AN UNPUBLISHED |
| JESSE STEPHEN BARBER, | ) OPINION AND SHALL NOT |
| | ) BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Joel E. Tingey, District Judge.

Judgment of conviction for violation of a no-contact order, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Jenny C. Swinford, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent.

---

BRAILSFORD, Judge

Jesse Stephen Barber appeals from his judgment of conviction for violating a no-contact order (NCO). We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The State charged Barber with intimidating a witness, Idaho Code § 18-2604, and violating an NCO, I.C. § 18-920. Barber pled not guilty and proceeded to trial. At trial, Barber primarily represented himself, although a "standby attorney" assisted him. Barber defended against the NCO violation by asserting the State failed to serve him with the NCO. The following evidence related to that defense was presented at trial.

In October 2017, Barber was charged with a crime against his girlfriend. As a result of that crime, the district court issued an NCO prohibiting Barber from having any contact with his

1

girlfriend, including by telephone. The State presented Sergeant White's testimony regarding the NCO's service on Barber. Sergeant White testified that her responsibilities at the jail included "attend[ing] arraignments and tak[ing] care of deliveries," including delivering court "paperwork" such as NCOs. Sergeant White testified that on October 23, she received an NCO for Barber, delivered it to him while he was sitting in the arraignment hallway in jail, explained it to him, saw him sign and date it, and countersigned and dated it. Based on Sergeant White's testimony that Exhibit 1 was a true and correct copy of the signed NCO, the district court admitted Exhibit 1 into evidence over Barber's objection.

Sergeant White further testified that once she serves an NCO on a defendant, she makes a copy of it for the defendant and for the file and places the original in the jail's "courthouse box" to be returned to the courthouse for filing. On cross-examination, Barber elicited from Sergeant White that the court's file stamp date on Exhibit 1 was October 24 at 8:44 a.m., and on redirect examination, Sergeant White testified it would be normal for an NCO served on the afternoon of October 23 to have "a court stamp the following morning."

After Sergeant White's testimony concluded, Barber moved to admit an unsigned version of the NCO identified as Exhibit D, and the State objected. The district court, counsel, and Barber had a discussion outside the jury's presence about the nature of the State's objection; i.e., Barber had failed to identify Exhibit D as a potential trial exhibit.[1] Barber explained to the court that he had received Exhibit D from the State in a discovery response on February 8, 2018; Exhibit D had a court file stamp date of October 23 at 3:23 p.m.; and he did not receive Exhibit 1 until the State's February 16, 2018, discovery response.

The district court explained to Barber that "there's a big difference between disclosing records in discovery and identifying a document as a potential exhibit." The court also explained to Barber that a defendant does not generally get to ask further questions of a witness after the State's "rebuttal questions" on redirect examination. The court, however, acknowledged it had not warned Barber (who was proceeding pro se during Sergeant White's testimony) about this limitation and offered to allow Barber to ask Sergeant White questions about Exhibit D. Specifically, the court stated that "if you have additional questions [for Sergeant White] about

---

[1]     Before trial, Barber's counsel signed and served on the State a witness and exhibit list. This list did not identify any exhibits.

why there may be a different date stamp on [Exhibit D], I'm going to let you ask that question if that's what you want to get into" to which Barber responded, "That's what I want to get into."

On Barber's recross-examination of Sergeant White, Barber elicited that, unlike Exhibit 1, five boxes at the end of Exhibit D were checked, including "File," "Sheriff's Office," "Prosecutor," "Defense Attorney," and "Protected Person" and that "the date on the bottom" of Exhibit D was October 23, 2017. On the prosecutor's further redirect-examination, Sergeant White explained that the October 23 date indicated the date the court faxed the NCO to the jail and that Exhibit D did not change her prior testimony that she served the NCO on Barber on the afternoon of October 23.

Then, the State presented the testimony of Lieutenant Vitacolonna to explain "Telmate," the jail telephone system, and the testimony of Detective Medrano, who testified Barber contacted his girlfriend by telephone from the jail on October 23 at 5:59 p.m. Barber's girlfriend also testified that Barber telephoned her through the jail's Telmate system on October 23. According to her testimony, Barber said during the phone call that "there was a no-contact order in place and that he couldn't talk to [her]." Further, she testified that she understood Barber was calling because he did not want her to appear to testify against him at a November 2017 court hearing, she told him she would not appear, and she in fact did not appear at the November 2017 hearing. The State then played a recording of the October 23 telephone call between Barber and his girlfriend. Afterwards, the girlfriend testified that Barber did not threaten, harass, or intimidate her during the call but that his statement that the charges against him would be dropped if she did not appear at the November 2017 court hearing influenced her not to show to testify against him.

Barber testified in his own defense through questioning by his "standby attorney." According to his testimony, on October 23 he returned from the arraignment hallway to "the tier" in the jail without ever being served with the NCO and never received it except in discovery in this case. Further, Barber testified that after returning to the tier on October 23, he called his girlfriend and was trying to "make that phone call before [being] served with a no-contact order." Additionally, Barber testified that he never signed an NCO and that the signature on Exhibit 1 looked like his but was a "copy." After the conclusion of Barber's testimony, Barber (acting pro se) again moved to admit Exhibit D; the State objected; and the district court sustained the objection because Barber did not disclose the document as a potential trial exhibit.

3

The jury convicted Barber of both intimidating a witness and violating the NCO, and Barber appeals his conviction for violating the NCO.[2]

## II.

## ANALYSIS

Barber argues the district court abused its discretion by refusing to admit Exhibit D into evidence. Idaho Criminal Rule 16(c)(1)(C) requires a defendant to disclose, upon the prosecutor's written request, documents the defendant intends to introduce in evidence at trial. When a party fails to comply with such a discovery request, the trial court may impose sanctions, including the exclusion of evidence. *State v. Wilson*, 158 Idaho 585, 588, 349 P.3d 439, 442 (Ct. App. 2015). "Sanctions serve the dual purposes of encouraging compliance with discovery and punishing misconduct." *Id*. Whether to impose a sanction and the appropriate sanction is within the trial court's discretion. *Id*. "To determine whether a sanction will be imposed and what it will be, the trial court must weigh the equities, balancing the culpability of the disobedient party with the resulting prejudice to the innocent party in light of the twin aims of the sanction power." *Id*. Demonstrating prejudice ordinarily requires showing the late disclosure hampers a party's ability to meet the evidence at trial, has a deleterious effect on a party's trial strategy, or deprives a party of the opportunity to raise a valid challenge to the admissibility of evidence. *State v. Allen*, 145 Idaho 183, 186, 177 P.3d 397, 400 (Ct. App. 2008).

When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018). A trial court's failure to analyze whether a party would suffer prejudice due to late disclosure constitutes an abuse of discretion. *State v. Lamphere*, 130 Idaho 630, 634, 945 P.2d 1, 5 (1997); *see also State v. Harris*, 132 Idaho 843, 847, 979 P.2d 1201, 1205 (1999) (concluding court abused discretion by not evaluating prejudice to State against defendant's right to fair trial).

---

[2] After his conviction, Barber filed a petition for post-conviction relief. The district court granted Barber's petition and ordered that he "be given an opportunity to appeal the Judgment of Conviction in this matter." Thereafter, the court entered an amended judgment from which Barber timely appeals.

On appeal, Barber does not dispute that he failed to timely disclose Exhibit D in violation of I.C.R. 16(c)(1)(C). Rather, Barber argues that the district court failed to analyze whether the admission of Exhibit D would prejudice the State and that the court "chose the harsh sanction of exclusion without examining any less severe remedies." In response, the State concedes the court failed to weigh the prejudice to the State of admitting Exhibit D against Barber's right to a fair trial. It argues, however, that this error was harmless.

Idaho Criminal Rule 52 provides that "any error, defect, irregularity or variance that does not affect substantial rights must be disregarded." Error is not reversible unless it is prejudicial. *State v. Stell*, 162 Idaho 827, 830, 405 P.3d 612, 615 (Ct. App. 2017). Accordingly, we examine whether the error is a harmless error. Previously, this Court has ruled that "where an error concerns evidence omitted at trial, the test for harmless error is whether there is a reasonable possibility that the lack of excluded evidence contributed to the verdict." *State v. Barcella*, 135 Idaho 191, 197, 16 P.3d 288, 294 (Ct. App. 2000); *see also Harris*, 132 Idaho at 847, 979 P.2d at 1205 (same). Recently, however, the Idaho Supreme Court clarified the harmless error standard in *State v. Garcia*, 166 Idaho 661, 462 P.3d 1125 (2020). In that case, the Court ruled that the application of the harmless error standard requires the appellate court to weigh the probative force of the record as a whole and at the same time compare it against the probative force of the error. *Id.* at 674, 462 P.3d at 1138. The reviewing court must take into account what effect the error had, or reasonably may have had, on the jury in the context of the total setting and in relation to all else that happened. *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

Applying this standard, we conclude the district court's failure to weigh Barber's right to a fair trial against the prejudice to the State of admitting Exhibit D was a harmless error. Contrary to Barber's assertion, the court did not choose "the harsh sanction of exclusion without examining any less severe remedies." Rather, the court provided Barber with a remedy for his failure to disclose Exhibit D by allowing him to question Sergeant White about the document, despite that Sergeant White's testimony had already concluded.

This remedy allowed Barber to elicit testimony from Sergeant White that the unsigned Exhibit D had a "stamped time" at the top of 3:23 p.m.; had a "date on the certification" of "2-8 of '18"; was not an "official court record" "from the arraignment room"; was not faxed to Sergeant White; had several boxes checked for "File," "Sheriff's Office," "Prosecutor," "Defense Attorney," and "Protected Person," which were not checked on the signed Exhibit 1;

5

had a statement certifying the document was "a full and correct copy of the original"; and had a date on the bottom of the unsigned document of October 23, 2017. In addition to this testimony, Barber testified that he was never served with the NCO; he never signed the NCO; he never saw the unsigned NCO, Exhibit D, until February 8, 2018, when the State produced it in discovery; he did not see the signed NCO, Exhibit 1, until February 16 when the State produced it in discovery; and the signature on Exhibit 1 was not his signature but a "copy" of it.

Based on his own testimony and that of Sergeant White about the differences between the unsigned Exhibit D and the signed Exhibit 1, Barber was able to effectively argue his theory of the case in closing argument, i.e., that the State never served the NCO on him as evidenced by the absence of a signature on Exhibit D and that the signature on Exhibit 1 was not his but manufactured. Specifically, Barber argued:

> Now, the no-contact order, I have absolutely no memory of receiving a contact order--a no-contact order. I went to court. The judge said, "No contact with the witnesses or victims." And you heard my testimony yesterday. Nobody sent me back with a paper. I don't remember signing anything. And this whole time I'm thinking, Well, they never served it on me. When I went back to the tier, I said, Well, I'd better get on the phone and call before I get this service, talk to her.
>
> . . . .
>
> The other thing about the no-contact order, when Ms. White was on the stand, I entered--I gave her an exhibit of the no-contact order that I received on February 8th. She read the date off to you on the official stamp that said February 8th. She also looked at the back page of it. There were no signatures on the back page of it. However, there were--each box was checked on the back page of it. And if I can have you refer back to State's Exhibit l.
>
> . . . .
>
> State's Exhibit l, which is a later copy, the date and time of the one that was given to Ms. White on the stand yesterday was October 23rd at 3:23 PM. That was the one that was sent to the jail for me to sign. And she testified that the boxes were checked on the signature page without signatures. The date at the top of this is October 24th, and the time is 8:44 AM. I don't know how many hours that is. That's like 12 plus 5, 17 hours later. Seventeen hours later with signatures on them from the date prior. However, no boxes are checked. How do you uncheck a box? How do you uncheck a box? The order was sent to the jail with the boxes checked saying that it was delivered to the file, the sheriff's office, the prosecutor, defense attorney, and the protected person. And Ms. White testified that each of those boxes were checked. How do you send--how do you uncheck a box? All of a sudden, my signature's on it and the boxes are unchecked. That doesn't make any sense to me. It doesn't make any sense whatsoever.

6

. . . If I would have signed that copy, the boxes would have been checked on that copy. But I didn't. How easy is it for someone to put light under something and sign over the top of it? How easy is it for someone to make a Xerox copy of someone's signature? I think what happened here is a case that was intended to be prosecuted was unable to be prosecuted, so the State decided to make a case out of nothing. That's why we're here today. And I think that's what you're going to decide as well.

As Barber's closing argument demonstrates, Barber was able to articulate his defense-- i.e., Sergeant White never served him with the NCO and he never signed the NCO--even without the admission of Exhibit D. Regardless, the jury rejected Barber's theory of the case and found him guilty. Weighing the probative force of the record as a whole against the probative force of the error, we hold that the court's exclusion of Exhibit D as a discovery sanction without first weighing the prejudice against the State was a harmless error. The probative force of the record as a whole includes that, among other things, Barber specifically acknowledged during his closing argument, during his testimony, and during the recorded telephone conversation with his girlfriend that he knew the district court had entered an NCO prohibiting him from contacting her and yet he contacted her anyway. Meanwhile, the district court's remedy of allowing testimony about Exhibit D diminished the probative force of the error, making it harmless in relation to the context of the entire trial.

## III.

## CONCLUSION

We hold that the district court's error in excluding Exhibit D without first weighing Barber's right to a fair trial against any prejudice to the State was a harmless error. Accordingly, we affirm the judgment of conviction for violation of the NCO.

Judge GRATTON and Judge LORELLO **CONCUR**.