64 P.3d 340

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Clinton Marshall HOOVER, Defendant–Appellant.**

No. 27683.

Court of Appeals of Idaho.

Feb. 10, 2003.

---

[1]. We also affirm the district court's denial of Roles' motion for summary judgment on the basis of our decision herein.

Molly J. Huskey, State Appellate Public Defender; Charles Isaac Wadams, Deputy Appellate Public Defender, Boise, for appellant. Charles Isaac Wadams argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

GUTIERREZ, Judge.

This is an appeal from a judgment of conviction entered after a jury found Clinton Marshall Hoover guilty of felony domestic battery, I.C. § 18–918(3). In this case, the victim testified that she could not remember the circumstances surrounding her injuries. Hoover argues that the district court abused its discretion in admitting testimony as to statements the victim made about her injuries to a security guard and others and erred in refusing to give jury instructions on his self-defense and defense of others theories. Hoover also argues that the district court erred in admitting testimony at his sentencing hearing as to other instances of his alleged domestic violence against other women. We affirm.

## I.

## FACTUAL AND PROCEDURAL SUMMARY

The following facts are adduced from the evidence presented at trial. Hoover and his fiancé, Mikel James, had been drinking vodka and began arguing in their apartment at about 9:00 p.m. on December 12, 2000. Their argument escalated. James wanted to leave the apartment, and she and Hoover wrestled for the car keys. Hoover prevented James from leaving by gripping her wrist and taking the car keys away from her. Somehow, James fell to the floor and hit the back of her head, losing consciousness for an unknown period of time.

At some point between 12:15 and 12:20 a.m. on December 13, James collapsed in a snow bank outside the apartment. At 12:30 a.m., a security guard, Joshua Smith, found her lying in a fetal position in a pool of blood in the snow—hysterical, shaking and crying, with her face actively bleeding. When Smith asked James what had happened, she told him that Hoover had beaten her.

At 12:38 a.m., Smith flagged down Deputy Heather Goldner and Detective Jeffery Thurman of the Kootenai County Sheriff's Department, who called for back up and an ambulance. Arriving by ambulance seconds later, Burt Maines, an emergency medical technician (EMT), began treating James' injuries within about two minutes of his arrival. James was still crying and, when questioned about the cause of her injuries, told Maines that Hoover had thrown her to the ground, kicked and stomped her, and grabbed her around the neck. Concerned that James' chest injury and difficulty in breathing might indicate broken ribs and a punctured lung, Maines wanted to transport her to the hospital, but James refused.

While being treated in the ambulance, James told Detective Thurman that she and Hoover had been drinking and had begun fighting, and that Hoover had injured her. James completed and signed a handwritten victim witness statement. Later on December 13, James went to the Kootenai County Medical Center for treatment for multiple contusions of the chest wall, left shoulder and hip secondary to a trauma, and contusions to her face, head, neck and wrist. James told the treating physician, Dr. Richard Thurston, that Hoover had caused her injuries. As a result of this incident, Hoover was arrested and charged with domestic violence.

At the preliminary hearing, James testified that she wanted the charge against Hoover to be dropped. She swore that she remembered nothing about the events surrounding her injuries, including her purported oral statements and the preparation of her written statement. Based upon Smith's testimony as to James' statements under an excited utterance hearsay exception, I.R.E. 803(2), the magistrate bound Hoover over for trial.

Prior to trial, Hoover moved to exclude all James' statements made at the scene. After hearing argument, the district court excluded as hearsay James' oral statements to the sheriff's officers, the EMT, and others, and excluded James' December 13 written state-

ment because those statements did not constitute excited utterances under Idaho Rule of Evidence 803(2). The court, however, ruled to admit James' statements to Smith as excited utterances.

At trial, James testified that on the day she sustained the injuries, she and Hoover had argued about their poor financial circumstances and about her lunch with a male friend. James stated that she and Hoover had consumed a significant amount of vodka. She testified that she did not recall when the argument became physical, but that somehow the back of her head hit the living room floor and that she lost consciousness for some unknown duration. She testified that the next thing she remembered was being directed into the ambulance. James testified that police officers later handed her a statement form, but that she did not know then why she was writing such a statement. James also testified that she did not remember how she was injured, telling anyone about those injuries, or completing a document describing how those injuries had occurred.

Over Hoover's hearsay objections, the court permitted Dr. Thurston to testify as to James' statements to him regarding an unidentified person's infliction of her injuries, that is, limited testimony to show how James' injuries had occurred, but not as to who had caused them. Guard Smith then testified that he saw James lying on the snow bank and approached her, asking what had happened. Over Hoover's hearsay objection, Smith testified that James stated that her boyfriend had beaten her. Smith also testified as to James' visible injuries.

Both sheriff's officers, James' mother and EMT Maines testified as to James' injuries, over Hoover's objections of cumulativeness. The district court also allowed the admission of photographs of James and her throat, ankle, hip, and upper thigh area and permitted James' mother to testify as to her observations of James' injuries as compared with those photographs. The court struck as speculative the mother's testimony that James' neck and ankle injuries resembled fingerprints, but the court permitted her testimony as to her observance of a boot print with tread marks in the photograph of

James' hip injury. James' mother also testified that James had no injuries on December 11 or 12.

The court overruled Hoover's hearsay objection regarding EMT Maines' testimony as to James' statements to him and permitted that testimony under a Rule 803(4) exception for statement to medical personnel. The court, however, limited Maines' testimony to James' statements as to how her injuries had occurred, and did not permit Maines to testify as to who James said had caused those injuries. Similarly, Hoover raised a hearsay objection to Detective Thurman's testimony regarding his inquiry of James and her responses as to what had happened. The court admitted the detective's testimony solely for purposes of impeaching James' prior testimony, and gave the jury a limiting instruction thereon.

The trial concluded with the presentation of the state's evidence. Hoover did not object to the jury instructions proposed by the court, but sought additional instructions on self-defense and defense of others theories. The court denied the requested instructions for lack of evidentiary support. The jury subsequently found Hoover guilty of domestic battery, I.C. § 18–918(3).

At the sentencing hearing, Hoover unsuccessfully objected on hearsay grounds to a victim advocate's testimony as to her previous contact with two of Hoover's former live-in girl friends, including her testimony as to the statements of one of these women. The court also admitted, over Hoover's objections, 1997–1999 police reports showing Hoover's arrests on three charges of domestic battery and one charge of aggravated assault with a firearm upon these two women.

The district court sentenced Hoover to a unified term of three and one-half years with one and one-half years determinate, to run concurrently with his sentences imposed on three other convictions. Hoover timely appeals from his judgment of conviction and sentence.

## II.

## ANALYSIS

Hoover argues that the district court abused its discretion in admitting hearsay,

impeachment, privileged, cumulative, and opinion evidence at trial and by admitting hearsay evidence of prior bad acts at his sentencing hearing without affording him sufficient opportunity to explain or rebut such evidence. Hoover also argues that the court erred in refusing to give jury instructions on his self-defense and defense of others theories.

## A. Evidentiary Rulings at Trial

We review the evidentiary rulings challenged by Hoover under an abuse of discretion standard. When a trial court's discretionary decision is reviewed on appeal, we conduct a multi-tiered inquiry to determine whether the trial court: (1) rightly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion and consistent with any legal standards applicable to specific choices; and (3) reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

At trial, the court has broad discretion in determining the admissibility of testimonial evidence. A decision to admit or deny such trial evidence will not be disturbed on appeal absent a clear showing of abuse of that discretion. *State v. Smith*, 117 Idaho 225, 232, 786 P.2d 1127, 1134 (1990).

### 1. Excited utterance exception

Hoover argues that the district court abused its discretion by permitting security guard Smith to testify as to James' statements to him under the Rule 803(2) excited utterance exception to the general evidentiary bar against hearsay. The trial court exercises its discretion to permit testimony of such excited utterances, giving consideration to the totality of the circumstances and provided two requirements are met. *State v. Hansen*, 133 Idaho 323, 325, 986 P.2d 346, 348 (Ct.App.1999). First, a startling event must have occurred such that the observer's normal reflective thought process is rendered inoperative. *Id.* Second, the proffered utterance must constitute a spontaneous reaction to that event, rather than the product of the observer's reflective thought. *Id.*

Hoover argues that the instant case is similar to *Hansen*, where we overturned the trial court's decision to admit a complainant's lengthy oral and written statements given to a police officer at least ten minutes after the alleged misdemeanor battery. The victim in *Hansen* was crying when she talked to the officer but otherwise had no physical injuries. Moreover, the complainant stated that she had never been angrier, a state of mind that generated concern as to the reliability of her statement. Furthermore, she had had time to regain her normal reflective thought process during her ten-minute walk to the police station. Finally, the complainant's composition of her written statement was even further removed in time from the event complained of and her prior discussions with the interviewing officer intervened to render her statement non-spontaneous and therefore not a reliable indicator of the truth as contemplated by Rule 803(2). The totality of the circumstances surrounding *Hansen* is thus distinguishable from that of the instant case.

Here, James' statements to Smith meet both requirements for excited utterances under Rule 803(2). The extensive physical injuries established that James had experienced a startling event that would have rendered her normal reflective thought process inoperative. When Smith arrived in the apartment parking lot on the night in question, he shone his car light upon the snow bank where he later saw James lying. He testified that he positioned his light to fall upon this snow bank at some time within the five-minute interval between 12:15 a.m. and 12:20 a.m. Smith then proceeded to complete paper work inside his car. When he looked up from his work at 12:30 a.m., he saw James lying in the snow bank. Approaching her, Smith observed James curled up in a fetal position in the snow. She was crying and hysterical. James lay in a pool of blood, and blood was streaming down her face and wrists. She was dressed in a bathrobe, T-shirt, and jeans and was shaking. Smith asked James what had happened, and she told him that her fiancé had beaten her. James was still crying and "pretty shaken up" when the EMT began to treat her in the ambulance some eight to ten minutes later.

The evidence that James was not lying in the snow bank at 12:15–12:20 a.m. and that blood was streaming down her face and wrists when Smith first observed her at 12:30 a.m. support the inference that James' injuries had transpired very shortly before she made her statements to Smith. Other testimony by Smith and Maines as to James' fetal position, extended crying, and hysteria substantiates the district court's conclusion that, even as late as about 12:40 a.m., James' statements continued to be the product of her shocked mental condition and a spontaneous reaction to the violence she endured, and that her battering was not then sufficiently removed in time as to re-engage her normal reflective thought process. *Hansen,* 133 Idaho at 325, 986 P.2d at 348. Thus, we conclude that the district court did not abuse its discretion in admitting James' statements to Smith as excited utterances.

### 2. Impeachment evidence

Hoover also asserts that the district court abused its discretion by allowing Detective Thurman's testimony. Hoover argues that the state offered James' testimony merely as a pretext for admitting Thurman's impermissible impeachment hearsay. Hoover notes that the state knew that James wanted the charges against Hoover to be dropped, that James had testified at the preliminary hearing that she was intoxicated and could not remember what had happened on the relevant night, and that the district court had ruled before trial that James' statements to Thurman did not constitute excited utterances. Thus, Hoover claims the state called James as an improper tactical maneuver to elicit her adverse testimony and thus set the stage for her purported impeachment by Thurman's testimony as to her otherwise inadmissible statements to him.

■■■ Any party, including the party calling the witness, may attack the credibility of a witness. *See* I.R.E. 607. Thurman's testimony that James remembered how her injuries were inflicted and gave statements about it to Thurman on December 13 is not inadmissible as hearsay where such testimony is not offered for the truth of the facts asserted and its sole evidentiary purpose is to impeach her credibility. *See* I.R.E. 613(b); *State v. Wood,* 126 Idaho 241, 248, 880 P.2d 771, 778 (Ct.App.1994). To determine whether the state examined James for the primary purpose of impeaching her before the jury with otherwise inadmissible substantive evidence, we review the evidence presented at trial rather than any subsequent explanation of the state's reason or motive for calling her to testify. *United States v. Gomez–Gallardo,* 915 F.2d 553, 555 (9th Cir.1990).

We conclude that the state had legitimate reasons to call James as a witness and did not call her for the primary purpose of gaining admission of otherwise impermissible evidence. James' testimony was key to establishing that Hoover was her boyfriend, thus connecting her testimony with the testimony of guard Smith that James identified her attacker as her boyfriend without naming Hoover. Furthermore, absent eyewitnesses to the attack, James' testimony that she and Hoover were alone, lived together in the apartment and had been engaged in an argument just before she was injured, supplied crucial circumstantial evidence of her attacker's identity and direct evidence as to household membership. *See* I.C. § 18–918(1), (3). The state in its closing arguments specifically relied on James' testimony for these two elements of proof. *Cf. Gomez–Gallardo,* 915 F.2d at 555. Accordingly, we hold that the district court did not abuse its discretion in admitting Thurman's testimony.

### 3. Other evidentiary rulings at trial

■■■ Hoover claims that James' statements to Dr. Thurston were inadmissible as confidential physician-patient communications under Rule 503(b)(2). Hoover's argument is without merit. Although in civil cases statements made to a physician for purposes of obtaining treatment for physical conditions are privileged, I.R.E. 503(b)(1), in criminal cases the privilege applies only to communications related to diagnosis or treatment of a mental or emotional condition. I.R.E. 503(b)(2).

■■ Hoover also argues against cumulative evidence where several persons testified as to the scope and nature of James' injuries.

We find no abuse of discretion, but even if the district court abused its discretion by admitting any such cumulative testimony in this regard, the admission of that testimony was harmless in view of other conclusive proof of the victim's injuries. Beyond a reasonable doubt, the jury's verdict of guilt would not have differed with the exclusion of some of that evidence. *State v. Velasquez–Delacruz*, 125 Idaho 320, 323, 870 P.2d 673, 676 (Ct.App.1994).

Hoover further contends that the district court abused its discretion in admitting testimony from James' mother that she observed a boot print with tread marks in the photograph of James' hip injury. The court rejected Hoover's objection that this testimony constituted speculation as to the cause of James' injury where the testimony simply described what James' mother observed in the photograph. Assuming *arguendo* that the admission of such observation was an abuse of discretion, any such error was harmless because, beyond a reasonable doubt, the outcome in Hoover's case would not have been different, absent that minor error. *See State v. Barcella*, 135 Idaho 191, 204, 16 P.3d 288, 301 (Ct.App.2000).

### B. Jury Instructions on Self–Defense and Defense of Others Theories

Next we consider Hoover's claim of error on the denial of his proposed jury instructions involving self-defense and defense of others theories. Whether the jury has been instructed properly is a question of law over which we exercise free review. *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). In determining whether the trial court should have given a requested jury instruction, we must examine the instructions that were given and the evidence adduced at trial. *State v. Fetterly*, 126 Idaho 475, 476, 886 P.2d 780, 781 (Ct.App.1994).

Idaho Code § 19–2132(a) requires that the trial court must state to the jury being charged "all matters of law necessary for their information," and must give a requested jury instruction if it determines that instruction to be correct and pertinent. Under a four-part test, a requested instruction must be given where: (1) it properly states the governing law; (2) a reasonable view of the evidence would support the defendant's legal theory; (3) it is not addressed adequately by other jury instructions; and (4) it does not constitute an impermissible comment as to the evidence. *Fetterly*, 126 Idaho at 476–77, 886 P.2d at 781–82; *State v. Evans*, 119 Idaho 383, 385, 807 P.2d 62, 64 (Ct.App.1991). To meet the second prong of this test, the defendant must present at least some evidence supporting his theory, and any support will suffice as long as his theory comports with a reasonable view of the evidence. *Fetterly*, 126 Idaho at 476–77, 886 P.2d at 781–82; *State v. Kodesh*, 122 Idaho 756, 758, 838 P.2d 885, 887 (Ct.App.1992).

Hoover claims entitlement to the requested jury instructions on theories that he acted against James in defense of others or self-defense under I.C. § 19–202A. Hoover's claim fails because his theories lacked evidentiary support. First, no evidence supports Hoover's reasonable belief, as required by the statute, that anyone was in imminent danger from or victimized by James. Second, Hoover presented no evidence at trial that he reasonably feared some degree of bodily harm from James. *See State v. Hansen*, 133 Idaho 323, 329, 986 P.2d 346, 352 (Ct.App.1999). Rather, Hoover relies on James' trial testimony that: (1) she was taking antidepressant and anti-anxiety medications at the time of trial in May 2001; (2) her physician suggested avoiding alcohol consumption with these medicines; (3) her behavior is somewhat, but not completely, rational when she consumes alcohol with these medicines; and (4) she attempted self-inflicted injuries when consuming unspecified medicine(s) with alcohol at some past time, none of which evidence is relevant to his claimed "self-defense" on the date in issue.

Hoover also suggests that James' testimony regarding their alcohol consumption that night and her past attempt to harm *herself* when combining alcohol and medicine supports an inference of his reasonable fear for *his* safety. However, no evidence shows that anything James did that night could have provoked a reasonable fear that she was going to harm Hoover.

**422**

Finally, Hoover claims as support James' testimony about their "wrestling" for the car keys that night, an incident that ended, and any threat from which accordingly abated, at about 9:00 p.m., some three to four hours before guard Smith encountered James in the snow with bleeding injuries. No reasonable view of the evidence supports Hoover's self-defense or defense of others theories. Thus, we conclude the district court did not err in rejecting Hoover's requested jury instructions.

## C. Evidentiary Ruling At Sentencing

▮▮▮▮ Finally, we address Hoover's argument that he was denied sufficient opportunity to explain or rebut allegations of his prior domestic violence incidents. After a criminal defendant's guilt has been established, the trial court has greater latitude regarding the information that it may consider for sentencing than could have been considered while the state was attempting to establish that guilt at trial. *State v. Brown,* 121 Idaho 385, 391, 825 P.2d 482, 488 (1992). The rules of evidence do not apply to sentencing proceedings. I.R.E. 101(e)(3); *State v. Creech,* 105 Idaho 362, 366, 670 P.2d 463, 467 (1983). The trial court, therefore, has broad discretion in the admission of evidence at a sentencing proceeding and properly may consider a wide range of relevant evidence in determining an appropriate sentence for the particular defendant before it. *Id.* Moreover, it is essential that the trial court receive all information available about the defendant before imposing sentence so that such sentence will reflect the character and propensity of the defendant as well as the circumstances of the offense. *Id.*

At sentencing, the district court permitted a victim advocate to testify as to her conversations with two of Hoover's former domestic partners. The advocate testified as to the statements by one of these women that Hoover had injured her. The court also admitted four police reports showing that Hoover had been arrested in 1997–1999 on three separate occasions for allegedly battering the two women. One such report documented his 1998 arrest for alleged aggravated assault using a firearm against one of these women.

Hoover then presented witnesses who offered their own testimony to rebut the evidence that Hoover repeatedly battered his domestic partners. Hoover's presentation of witnesses to rebut the state's evidence undermines his argument that the district court did not afford him the opportunity to explain or rebut the allegations of prior domestic violence incidents. We thus hold that the district court did not abuse its discretion in admitting such evidence at sentencing.

## III.

## CONCLUSION

We conclude that the district court did not abuse its discretion in admitting at trial James' statements to the security guard as an excited utterance. We also conclude that the district court did not abuse its discretion in making its other evidentiary rulings at trial and at sentencing and that if any were error, such constituted harmless error. Finally, we conclude that the district court did not err in rejecting Hoover's requested self-defense or defense of others jury instructions. Thus, we affirm Hoover's judgment of conviction and sentence.

Chief Judge LANSING concurs.

Judge Pro Tem SCHWARTZMAN, Specially Concurring.

I concur in the opinion of this Court, but wish to write separately on the use of Detective Thurman's testimony regarding James' statements to him to impeach her testimony that she later lacked any memory of the events.

Prior to trial, the district court had issued an order excluding all of James' statements to police officers other than security guard Smith as not falling within the excited utterance exception to the hearsay rule, I.R.E. 803(2). However, the trial court then permitted Thurman to testify concerning the *specific details* of James' account to him for purposes of impeachment. The court also gave a limiting instruction to the jury that this evidence was admitted "solely for the purpose of testing the credibility of the witness, and not as substantive evidence of the

truth of the facts contained in such statements."

The above evidentiary rulings are technically correct. However, I think it takes a combination of wishful thinking and the willing suspension of disbelief to require a jury to follow the court's limiting instruction when it has now been made privy to the specific details of the admittedly hearsay account to the police officer. If the intent of the ruling is to impeach credibility—here, a negative of "I don't remember"—then all the jury really needs to know is (1) that the witness previously did remember a particular incident and (2) that the witness gave a specific version of what happened, verbally and in writing, to the officer. The jury need not, and indeed *should not*, be given or exposed to a verbatim hearsay account of those statements when its sole purpose is to impeach credibility. Juries are not superhuman and should not be needlessly expected to act as trained legal evidentiary scholars.

Alternatively, the day may come when such recanted or inconsistent statements may be admissible as substantive evidence pursuant to I.R.E. 803(24)—other exceptions: the *convenient lapse of memory* or *I tripped and fell excuse* in domestic battery cases where the domestic partners have since reconciled.