**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 40359**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2014 Opinion No. 1 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: January 6, 2014 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| JOSEPH THOMAS IVERSON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. Hon. John R. Stegner, District Judge; Hon. Robert J. Caldwell, Magistrate.

Order, on intermediate appeal, affirming judgment of conviction for battery, <u>affirmed</u>.

John M. Adams, Kootenai County Public Defender; Marcus O. Draper, Deputy Public Defender, Coeur d'Alene, for appellant. Jay W. Logsdon argued.

Hon. Lawrence G. Wasden, Attorney General; Nicole L Schafer, Deputy Attorney General, Boise, for respondent. Nicole L. Schafer argued.

---

GUTIERREZ, Chief Judge

Joseph Thomas Iverson appeals from the district court's intermediate appellate order affirming Iverson's judgment of conviction for battery. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

Darryl Farnham received word that his former girlfriend was involved in an altercation with her current boyfriend, Iverson. Darryl and three others drove to the house where the former girlfriend and Iverson lived in order to come to her aid. After finding out she was no longer at the residence, Darryl stood next to his vehicle parked in front of the residence, talking on the phone. Iverson approached him, grabbed the phone, threw it in the street, and engaged in a verbal altercation with Darryl for several minutes, telling Darryl to leave the property on several

1

occasions. Dustin North, who had arrived with Darryl, exited the vehicle and began slowly walking towards Iverson. Iverson then punched Darryl once in the face, causing Darryl to sustain multiple fractures requiring surgery and the insertion of titanium plates and screws. Darryl and several witnesses stated Darryl had been turning away from Iverson at the time of the punch.

On July 13, 2011, Iverson was issued a citation charging him with battery, Idaho Code § 18-903. A jury trial was scheduled to commence on October 19. On October 5, during the pretrial conference, Iverson first alerted the State that he intended to claim self-defense. On October 11, after the discovery deadline passed, the State disclosed an additional potential witness, Shawn Farnham, Darryl's brother, who would testify to several text messages Iverson sent Shawn following the incident, at least one of which indicated a motive for the use of force other than self-defense. In the days that followed, the State also disclosed its intent to call Dr. Farr, Darryl's treating doctor, as a potential expert witness and disclosed Darryl's medical records and photographs of his injuries taken before and after surgery. On the morning of trial, Iverson requested that Shawn and Dr. Farr be excluded from testifying and that introduction of the medical records and photographs be disallowed because the late disclosure of the witnesses, records, and photographs hampered his ability to prepare for trial.[1] The magistrate limited Dr. Farr to testifying as a custodian of the medical records, preventing him from testifying as to Darryl's injuries, but allowed the admission of Shawn's testimony and the medical records and photographs. Iverson also requested that the photographs be excluded pursuant to Idaho Rule of Evidence 403 because they were unfairly prejudicial and minimally probative. The magistrate denied the motion.

At trial, Iverson testified he did not feel threatened by Darryl specifically, but felt threatened by Darryl and his friends' presence on the property and by North's (a large man) slow approach towards him while clenching his fists. Iverson testified he felt it necessary to punch Darryl because he could not turn his back on Darryl in order to defend himself against North. Both Darryl and North testified they had not used, and did not intend to use, force against

---

[1] Iverson also requested that another witness, Darren Potter, be excluded because Potter was not disclosed as a potential witness until October 18. The magistrate granted this request, and it is not at issue on appeal.

Iverson during the verbal exchange. Several witnesses testified Darryl never acted aggressively toward Iverson. Shawn testified that shortly after the incident, Iverson sent him a text message stating, in relevant part: "I just beat the f--- out of your brother. It's been a long time comin'."

The jury found Iverson guilty as charged. He timely appealed his conviction to the district court, arguing the prosecutor committed misconduct by making certain statements in the pretrial hearings and during her closing arguments. He also argued the magistrate erred by allowing admission of the photographs and other evidence. Following a hearing, the district court affirmed the conviction. Iverson now appeals.

## II.

## ANALYSIS

On appeal, Iverson contends the prosecutor committed misconduct by making pretrial misrepresentations to the magistrate and making factual and legal misstatements to the jury during closing arguments. He also argues the magistrate abused its discretion by admitting the photographs of Darryl's injuries. He further contends his right to due process was infringed by the magistrate's decision to allow the State to call Shawn and Dr. Farr as witnesses and to introduce Darryl's medical records and the photographs of Darryl's injuries even though the State belatedly disclosed this evidence. Finally, he asserts that even if the alleged errors were individually harmless, the cumulative error doctrine requires a reversal of his conviction. On review of a decision of the district court, rendered in its appellate capacity, we examine the record from the magistrate court to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008); *State v. DeWitt*, 145 Idaho 709, 711, 184 P.3d 215, 217 (Ct. App. 2008).

### A.     Prosecutorial Misconduct

Iverson contends the prosecutor committed misconduct requiring a reversal of his conviction. Specifically, he contends the prosecutor made several misrepresentations to the magistrate prior to trial in arguing for the admission of certain evidence and misstated both facts and the law during closing arguments.

#### 1.     Pretrial statements

Iverson argues the prosecutor committed misconduct by making several misrepresentations to the court during a motion in limine hearing prior to trial. He contends the

prosecutor misled the trial court in her arguments opposing his motion to exclude photographs of Darryl taken after surgery and to exclude Shawn's testimony as a sanction for the State's late disclosure of Shawn as a possible witness. Iverson did not contemporaneously object to these statements, but raised the issue for the first time on intermediate appeal.

Although our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he or she is nevertheless expected and required to be fair. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). However, in reviewing allegations of prosecutorial misconduct, we must keep in mind the realities of trial. *Id.* A fair trial is not necessarily a perfect trial. *Id.* Since Iverson made no contemporaneous objection to the prosecutor's alleged misrepresentations at trial, the fundamental error doctrine in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), is applicable. If the alleged misconduct was not followed by a contemporaneous objection, an appellate court should reverse when a defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Id*. at 226, 245 P.3d at 978.

Iverson first asserts the prosecutor "affirmatively misled the trial court in its argument" regarding its opposition to Iverson's motion to exclude photographs of Darryl taken after surgery. The prosecutor argued the photographs were probative because they would "substantiate other evidence that [Iverson] had an object in his hand when he struck [Darryl]." Iverson points to the fact the State did not present any evidence at trial to support this theory. At the hearing on intermediate appeal, the prosecutor indicated that based on various conversations with witnesses to the incident, one of the State's theories developed in preparation for trial had been the possibility that Iverson had something in his hand when he struck Darryl. As the trial progressed, however, the prosecutor indicated she decided not to present evidence to that effect because it was potentially "speculative." The district court determined the record did not support a finding that the prosecutor engaged in misconduct, noting that whether Iverson had something in his hand when he struck the victim was a "fairly arguable issue[]."

We agree that Iverson has not shown the statement at issue amounted to misconduct, let alone amounted to fundamental error. He has not shown the prosecutor made an affirmatively false representation to the magistrate in characterizing the possible probative value of the

photographs in an effort to obtain admission of the photographs. The most reasonable explanation, as recognized by the district court and which Iverson has not submitted evidence to refute, is that provided by the prosecutor--she intended to present evidence supporting this theory, but changed course after determining the evidence was not strong. This simply does not amount to misconduct, and notably, Iverson does not provide any authority to support his contention that it does.

Iverson also asserts the prosecutor committed misconduct by "deceiving" the court regarding the nature of Shawn's testimony when she stated, in opposition to Iverson's motion to exclude the witness, that Shawn was a witness to the incident. Iverson contends the prosecutor's "misleading" statement as to the nature of Shawn's testimony prevented him from effectively cross-examining Shawn. The issue arose when, at a motion hearing on the morning of trial, Iverson objected to the late disclosure of several potential witnesses, including Shawn, and requested that their testimony be excluded. In response, the prosecutor represented to the magistrate that "the witnesses that [Iverson is] objecting to . . . are people who were *present on that date* with the exception of Dr. Farr." (Emphasis added.) At trial, however, Shawn testified he only became aware Iverson had punched his brother when Iverson texted him after the fact. Iverson's only objection to this testimony--that it was hearsay--was overruled, and Iverson cross-examined Shawn as to the existence of the text messages.

Again, this does not rise to the level of prosecutorial misconduct, let alone misconduct implicating a constitutional right as is required to be fundamental error. Although the prosecutor's blanket statement regarding the list of witnesses Iverson was objecting to may have been technically inaccurate to the extent it implied Shawn was physically at the scene of the incident, it was inconsequential--both in the larger scheme and in regard to the court's decision to allow Shawn to testify. The crux of the State's argument in support of allowing the testimony was that it disclosed the witnesses as soon as it was made aware of their testimony. After defense counsel informed the magistrate that Shawn was disclosed as a potential witness eight days prior to the trial, while another potential witness was disclosed only the day before, the magistrate allowed Shawn's testimony, but rejected the latter's. Furthermore, Iverson's contention that the prosecutor's statement somehow hampered his ability to cross-examine Shawn strains credulity: Iverson specifically indicated the State had disclosed Shawn as a potential witness eight days before the trial and did not complain that he did not know the

5

content of Shawn's potential testimony. Iverson has not shown the prosecutor committed misconduct in this instance.

## 2. Closing arguments

Iverson argues the prosecutor misstated the law of self-defense in closing arguments and misstated facts regarding the evidence. Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. *Herring v. New York*, 422 U.S. 853, 862 (1975); *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Its purpose is to enlighten the jury and to help the jurors remember and interpret the evidence. *Phillips*, 144 Idaho at 86, 156 P.3d at 587; *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002, 1007 (Ct. App. 1991). Both sides have traditionally been afforded considerable latitude in closing arguments to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003); *Phillips*, 144 Idaho at 86, 156 P.3d at 587. Considerable latitude, however, has its limits, both in matters expressly stated and those implied. *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

### a. Misstatement of the law

Iverson contends the prosecutor committed misconduct by misstating the law applicable to self-defense in her closing arguments. It is prosecutorial misconduct for a prosecutor to misstate the law in closing arguments. *State v. Coffin*, 146 Idaho 166, 170, 191 P.3d 244, 248 (Ct. App. 2008); *Phillips*, 144 Idaho at 86, 156 P.3d at 587. However, since counsel did not object to this statement at trial, the conviction will be set aside for prosecutorial misconduct only upon a showing by the defendant that the alleged misconduct rises to the level of fundamental error. *Perry*, 150 Idaho at 228, 245 P.3d at 980.

During closing arguments, the prosecutor framed the key dispute between the parties as whether Iverson's use of force against Darryl was unlawful. She continued:

> The only way in which that is . . . lawful . . . is if Mr. Iverson was genuinely attempting to defend himself. He genuinely found himself in a situation where his *only and best option* according to a reasonable person would have been to harm Darryl Farnham.

(Emphasis added.) Iverson contends the assertion that the use of force must have been his "only and best option" misstates the law because it implies Iverson's punch could not be legally justified if he could have retreated. This, he contends, "misstates the law as the Appellant has no

6

duty to retreat, even if retreating is a better option." Iverson also points out that following the statement excerpted above, the prosecutor mentioned, on several more occasions, Iverson's failure to leave the scene instead of resorting to force:

> [Iverson] chose to stay in a location that created tension and then to resolve that situation before anyone had thrown a punch at Mr. Iverson or anyone threatened to.
>
> . . . .
> . . . Well, Mr. Iverson himself acknowledged that the better option here would have been to go and call the officers then.
>
> . . . .
> [Iverson] corners [Darryl] for five minutes, ladies and gentlemen, time when he could have walked away, gone into the house, called [the] officers.

In the nonhomicidal context, the right to defend oneself from attack is embodied in several Idaho statutes. Idaho Code § 19-201 provides that "[l]awful resistance to the commission of a public offense may be made: (1) By the party about to be injured"; and Idaho Code § 19-202 specifies that "[r]esistance sufficient to prevent the offense may be made by the party about to be injured: (1) To prevent an offense against his person . . . ." Idaho Code § 19-202A further provides that "[n]o person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting himself . . . by reasonable means necessary . . . ."[2] Thus, pursuant to these statutes, in order to assert self-defense, a defendant must show he reasonably believed he was in imminent danger of bodily harm, *State v. Hoover*, 138 Idaho 414, 421, 64 P.3d 340, 347 (Ct. App. 2003), and that he reasonably believed the force used was necessary to repel the victim's attack, *State v. Hernandez*, 133 Idaho 576, 585, 990 P.2d 742, 751 (Ct. App. 1999). The kind and degree of force that a person may lawfully use in self-defense is limited by what a reasonable person in the same situation as such person, seeing what that person sees and knowing what that person knows, then would believe to be necessary. *See id.* Any use of force beyond that is regarded by the law as excessive. *Id.* Although a person may believe he is acting, and may act, in self-defense, he is not justified in using a degree of force clearly in excess of that apparently and reasonably necessary under the existing act and circumstances. *Id.*

---

[2] Additional self-defense provisions applicable only to homicide charges are found in Idaho Code § 18-4009.

7

As Iverson points out (but upon which he does not elaborate), it is commonly stated that Idaho adheres to a "no duty to retreat" rule in regard to self-defense. The model jury instruction (relevant to self-defense rather than defense of others), given in this case, states:

> In the exercise of the right of [self-defense], one need not retreat. One may stand one's ground and defend [oneself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. This law applies even though the person being [attacked] might more easily have gained safety by flight or by withdrawing from the scene.

Idaho Criminal Jury Instruction 1519[3] (citing *State v. Dunlap*, 40 Idaho 630, 637, 235 P. 432, 434 (1925); *State v. McGreevey*, 17 Idaho 453, 466, 105 P. 1047, 1051 (1909)). Iverson contends the prosecutor's statement that the use of force must have been Iverson's "only and best option," as well as her references during closing arguments to the fact that Iverson could have left the scene as opposed to resorting to force, ran afoul of this principle.

Unlike many states, Idaho has no statute concerning the duty of a defendant to retreat (or not) before exercising self-defense. Thus, we examine the genesis of the "no duty to retreat" rule in Idaho: *McGreevey*, 17 Idaho 453, 105 P. 1047. There, McGreevey was charged with fatally shooting the victim, but claimed he had done so in self-defense. On appeal, McGreevey took issue with the following instruction given to the jury:

> The court instructs the jury that before a party can justify the taking of life in self-defense he must show that there was reasonable ground for believing that he was in great peril and that the killing was necessary for his escape and that no other safe means was open to him. When one believes himself about to be attacked by another and to receive great bodily injury, it is his duty to avoid the attack if he can safely do so; and the right of self-defense does not arise until he *has done everything in his power to avoid this necessity.*

*Id*. at 466, 105 P. at 1051 (emphasis added). The Idaho Supreme Court determined the entire instruction was clearly erroneous, but focused its most "serious objection" on the assertion that "the right to self-defense does not arise until he has done everything in his power to avoid this necessity." *Id*. at 467, 105 P. at 1051. The Court elaborated:

> This is not the test to be applied . . . . A man placed under an apparently threatening and menacing danger is only expected to act as a reasonably prudent

---

[3] We are not asked in this appeal to determine whether the model jury instruction accurately states Idaho law on self-defense.

8

person would act under similar circumstances and surroundings. Under such circumstances he ordinarily has but a moment for deliberation and decision. It might so happen that, as a matter of fact, he could have done any one of a number of other things, and thereby have avoided the danger and refrained from committing the homicide. After he has acted he cannot be judged from the theoretical standpoint of the man who is resting in both apparent and real safety, confronted by no danger and menaced by no threats or demonstrations of sudden violence and felonious import. He must act quickly. *He must act as a reasonable and prudent man would be likely to act under similar conditions and circumstances, and this is all the law, reason or justice demands.*

*Id*. (emphasis added). *Accord Dunlap*, 40 Idaho at 637, 235 P. at 434 ("This instruction enjoined the appellant to do all in his power to avoid the conflict, even to retreating. This was error.").

The Supreme Court again addressed the general issue in *State v. Fox*, 52 Idaho 474, 16 P.2d 663 (1932), where the appellants, who claimed they killed in self-defense, objected to a self-defense instruction given the jury which included the charge that in order to show justifiable self-defense, the evidence must show "there was no other reasonable hope of escape from such present impending peril." *Id*. at 489, 16 P.2d at 669. The appellants argued this clause indicated to the jury that it was incumbent upon the defendants to attempt to escape before they could avail themselves of the plea of self-defense. The Supreme Court first noted the phrase did not say "'*no other hope of escape*,' but 'no other *reasonable* hope of escape.'" *Id*. The Court concluded that although it did not approve of the word "escape" in the instruction, "it was apparent that it was used in the sense of avoid; not of flight." *Id*. at 490, 16 P.2d at 669. Self-defense, the Court noted, is only a justifiable excuse for homicide when reasonable. *Id*. (citing *McGreevey*, 17 Idaho at 467, 105 P. at 1051). The Court surmised the "instruction did not advise the jury that defendants must have done all within their power to avoid the difficulty; only a *reasonable* attempt, which is sufficient." *Id*. (citing *Dunlap*, 40 Idaho at 636, 235 P. at 433-34) (emphasis added).[4]

---

[4]     We note there are several Idaho cases that seem to depart from the "no duty to retreat" principle. In *State v. Livesay*, 71 Idaho 442, 448, 233 P.2d 432, 436 (1951), the Supreme Court approved a self-defense instruction containing the following language:

If she could have withdrawn safely from the danger it was her duty to retreat. But as, where the attack is sudden and the danger imminent, if to retreat would increase her danger, so situated she may stand her ground, that becoming her

It is clear from this case law that although a party in Idaho may not have a *duty* to retreat prior to engaging in force in self-defense, the defendant's actions in this regard are not completely immune to being assessed against the reasonableness standard. In other words, a party is not *required* to retreat, but he is required to act reasonably. Indeed, the right of self-defense in Idaho has long been grounded in the concept of the "reasonable" person. *See, e.g.*, *McGreevey*, 17 Idaho at 466, 105 P. at 1051; *State v. Baker*, 103 Idaho 43, 45, 644 P.2d 365, 367 (Ct. App. 1982). There is nothing in the case law concerning retreat that departs from this standard. To completely shield a defendant's actions regarding anything having to do with the possibility of retreat abandons this preeminent requirement of reasonableness.[5]

---

> "wall", and to use such force as necessary to repel the force directed toward her, even if it be proved that she might more easily have gained her safety by flight.

*Id*.

[5] Several commentators have recognized the difficulties in reconciling a "no duty to retreat" rule with the bedrock requirements of self-defense--reasonableness, necessity, and imminence--especially since "in the case of an individual claiming self-defense and a 'right to stand their ground,' the situation typically is ambiguous and involves aggressive or unlawful activity by both parties." J. Dave Williamson, Comment, *Untying the Hands of Prosecutors in "Stand Your Ground" States: Rethinking the Jury Charge on Reasonableness for Altercations Occurring Outside One's Home*, 6 J. MARSHALL L.J. 243, 268 (2012). For example, prosecutors will often argue, as was the case here, that a defendant's actions in using force were not reasonable if a clear path of retreat existed. As one commentator writes:

> Another area that creates ambiguity . . . is the notion that the factfinder ought to make a generalized inquiry into the "reasonableness" of the defendant's conduct. One situation in which this problem arises is when the prosecution has suggested that the defendant had the opportunity to retreat, but the jurisdiction does not require retreat. The court may respond that the issue was nonetheless appropriate for the factfinder to consider in assessing the "reasonableness" of the defendant's behavior. The defendant's failure to retreat--even in a jurisdiction with a no-retreat rule--is deemed relevant to whether he acted "reasonably" in using lethal force.

Margaret Raymond, *Looking for Trouble: Framing and the Dignitary Interest in the Law of Self-Defense*, 71 OHIO ST. L.J. 287, 313-14 (2010). Indeed, can a defendant's decision to utilize force truly be considered reasonable if a clear and safe path of retreat existed? And can the use

Other courts have recognized this principle--finding the ability to retreat relevant to the requisite reasonableness and imminence inquiries in any self-defense case. In *State v. Renner*, 912 S.W.2d 701, 703-04 (Tenn. 1995), the court examined the effect of a "no duty to retreat" rule codified by the Tennessee legislature, prescribing that a party is not required to retreat from the threatened attack of another even though they may safely do so and is not required to pause and consider whether a reasonable person might think it possible to safely flee rather than to attack and disable or kill the assailant. There, Renner was visiting his ex-girlfriend when her current boyfriend arrived at the residence; Renner and the boyfriend argued. After some time passed, Renner was in the kitchen alone and claimed he heard the boyfriend, whom he knew to often be armed and to be "high" that night, load a gun in the living room. Fearing for his safety, Renner pulled out his own firearm and started exiting the house through the living room when he heard the boyfriend threaten him and saw the boyfriend reaching into his rear pocket. Renner shot the boyfriend dead. On appeal, Renner claimed he shot the victim in self-defense. He argued the prosecutor improperly suggested he should have retreated when the prosecutor asked him on cross-examination whether there was a feasible exit in the kitchen and by referring, in closing arguments, to the kitchen door and suggesting it afforded Renner a way out that would

---

of force truly be considered necessary if the same circumstances exist? As one commentator puts it:

> [T]he rejection of the retreat requirement in a majority of American jurisdictions and the adoption of the castle doctrine [allowing for defense of the home without retreat] even where the law would otherwise require retreat reflect a focus on other concerns besides necessity. If the need to preserve life were the exclusive justification for self-defense doctrine, retreat would always be required. Someone who could, with complete safety, avoid the need to resort to lethal force by running away from the threat has no real "need" to use that force. Necessity--or more correctly, its absence--is routinely articulated as the theoretical basis for the retreat rule.

*Id*. at 302-03.

Similar considerations arise in the context of an imminence inquiry. As the Oklahoma Court of Appeals has recognized, "there is the presumption in imminence that the defender may find an alternative to the use of deadly force," which necessarily implicates the duty to retreat, "which duty is implicit in said presumption." *Bechtel v. State*, 840 P.2d 1, 12 (Okla. Crim. App. 1992).

11

have permitted him to avoid a confrontation with the boyfriend in the living room. The court concluded the prosecutor's references to the possibility of escape from the kitchen was not reversible error. *Id.* at 704-05. The court recognized that whether the "no duty to retreat" rule applies in a particular case is a matter to be determined by the jury, in addition to determining whether the defendant's belief of imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault. The court then rejected Renner's argument that the prosecutor's references to a possible alternate exit improperly suggested the defendant was required to retreat, finding these questions were useful in eliciting testimony relevant to many of the issues the jury would have to determine: (1) the circumstances under which the confrontation occurred; (2) whether Renner was lawfully on the premises; (3) whether Renner's conduct under the circumstances was reasonable; and (4) whether Renner perceived himself to have been in imminent danger. *Id. See also State v. Carraby*, 88 So. 3d 608, 617 (La. Ct. App. 2012) ("In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger."); *Allen v. State*, 871 P.2d 79, 93 (Okla. Crim. App. 1994) ("While we do not overrule our earlier holdings that a party has no duty to retreat from a confrontation, we believe the possibility of escape should be a recognized factor in determining whether deadly force was necessary to avoid death or great bodily harm.").

Based on the foregoing, we conclude the prosecutor's references to the circumstances of the confrontation and Iverson's failure to leave the scene did not amount to error, but cited permissible factors for the jury to consider in determining the reasonableness of Iverson's conduct under the circumstances and addressing the requisite inquires of imminence and necessity. It was in discussing whether Iverson perceived himself to be in imminent danger of bodily harm, pointing out that North was moving "slowly" towards Iverson and it was not a "quick scenario that [Iverson] had to break out of," that the prosecutor remarked that Iverson "chose to stay" in the location. The prosecutor's statement that Iverson himself had acknowledged a better course of action was to call law enforcement, was made in the context of the prosecutor's argument that the use of force had not been necessary and had been motivated by the situation with Iverson's girlfriend, rather than a reasonable fear of imminent injury. These statements were not erroneous statements of the law.

12

However, the prosecutor's statement at closing arguments that the jury could find Iverson acted lawfully in self-defense only if it found the use of force was his "only and best option according to a reasonable person" was a misstatement of the law. This statement indicates force may *never* be lawfully used in self-defense if the defendant had any other option but to use force. The law does not require this. As the Court explained in *McGreevey*, a defendant may be found to have acted reasonably under the circumstances *even if* "[i]t might so happen that, as a matter of fact, he could have done any one of a number of other things, and thereby have avoided the danger and refrained from committing the homicide." *McGreevey*, 17 Idaho at 467, 105 P. at 1051. Thus, the use of force need not be the *only* option, it must merely be a *reasonable* choice.

In order to constitute fundamental error, however, the defendant must show the error affected the defendant's substantial rights, generally by showing a reasonable probability the error affected the outcome of the trial proceedings. *Perry*, 150 Idaho at 228, 245 P.3d at 980. Such is not the case here. The prosecutor's statement was a short, isolated event in the context of much larger closing arguments that correctly went through the elements of self-defense. In addition, the jury was specifically given the instruction excerpted above, which informed them Iverson had no duty to retreat, and was given the Idaho model self-defense instruction that set forth the correct inquires the jury was to make in determining whether Iverson was justified in using force. *See* I.C.J.I. 1517. The jury was also instructed that it was to apply the law set forth in the instructions, "regardless of . . . what either side may state the law to be." We presume that the jury followed the district court's instructions. *See State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct. App. 1996). Iverson has not shown a reasonable probability the error affected the outcome of the trial proceedings and, thus, has not shown the prosecutor's statement constituted fundamental error.

### b.      Misstatement of the facts

Iverson also contends the prosecutor committed misconduct by arguing Iverson "knew that he might fracture the complaining witness' eye socket when he punched him because there were no facts in evidence to support such an assertion." The State counters that the argument was a permissible inference from the facts presented at trial and did not constitute misconduct.

13

During her closing arguments, the prosecutor made the following statements:

> Now, I'm not a doctor and I don't have medical training and I don't know if . . . any of you do . . . so I don't know exactly what we're talking about. But I do know that we're talking about numerous fractures. We're talking about some serious bodily harm. I would submit to you that that is excessive force. And I would also submit to you that Mr. Iverson, given the kind of training he had as a black belt in Taekwondo, understood that this is the sort of thing that's gonna result from the blow that he landed. He acknowledged that he's been doing this for a long time.

Iverson objected on the basis there was no evidence in the record that he knew his punch would result in a fracture; the magistrate overruled.

It is plainly improper for a party to present closing argument that misrepresents or mischaracterizes the evidence. *State v. Felder*, 150 Idaho 269, 274, 245 P.3d 1021, 1026 (Ct. App. 2010); *State v. Troutman*, 148 Idaho 904, 911, 231 P.3d 549, 556 (Ct. App. 2010); *State v. Beebe*, 145 Idaho 570, 575, 181 P.3d 496, 501 (Ct. App. 2007). In addition, it constitutes misconduct for a prosecutor to place before the jury facts not in evidence. *Felder*, 150 Idaho at 274, 245 P.3d at 1026; *State v. Gerardo*, 147 Idaho 22, 26, 205 P.3d 671, 675 (Ct. App. 2009); *Phillips,* 144 Idaho at 86, 156 P.3d at 587. However, as noted above, a prosecutor is entitled to discuss fully the evidence and the inferences to be drawn therefrom. *Sheahan*, 139 Idaho at 280, 77 P.3d at 969; *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

Iverson's argument fails because the prosecutor's statement was a permissible inference from the evidence presented at trial. Specifically, Iverson testified he was a first degree black belt in Taekwondo and had been trained in proper technique and control in regard to "how to properly punch someone." Based on this training, it was reasonable for the prosecutor to infer, and argue to the jury, that Iverson knew the potential seriousness of the injuries he could inflict on Darryl with a punch to the face. The prosecutor's statement did not amount to misconduct.

B.      **Admission of Photographs**

Iverson argues the magistrate abused its discretion under Idaho Rule of Evidence 403 by allowing the State to introduce photographs of Darryl's injuries. He contends the magistrate erred by failing to conduct a Rule 403 balancing test before admitting the photographs and that the photographs should not have been admitted because their probative value was substantially outweighed by the danger of unfair prejudice.

14

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury; or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. I.R.E. 403. To exclude evidence under Rule 403, the trial court must address whether the probative value is substantially outweighed by one of the considerations listed in the rule. *State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010). The trial court's determination is reviewed for an abuse of discretion. *State v. Ellington*, 151 Idaho 53, 64, 253 P.3d 727, 738 (2011).

Prior to trial, Iverson objected to admission of the photographs, contending they were of little probative value since Iverson admitted punching Darryl and carried a high danger of unfair prejudice given the "graphic nature" of the stiches and "the extent of the swelling that occurred from the one punch." The State responded that the photographs were relevant to show Iverson used excessive force. The magistrate verbally declined to exclude the photographs without explaining its reasoning. In affirming the trial court on this issue, the district court indicated that, although it would have been "much more helpful" for the magistrate to have indicated on the record the relevance of the photographs and that the danger of unfair prejudice did not outweigh their probative value, it could "infer from what [the court] decided, based on the argument made by [defense counsel]."

Even accepting Iverson's contention that it was per se error for the trial court to fail to conduct a Rule 403 balancing test on the record, Iverson has not shown reversible error because he has not identified any unfair prejudice or a lack of probative value to weigh. *See State v. Fordyce*, 151 Idaho 868, 870, 264 P.3d 975, 977 (Ct. App. 2011). Evidence is only unfairly prejudicial when it suggests decision on an improper basis. *State v. Pokorney*, 149 Idaho 459, 465, 235 P.3d 409, 415 (Ct. App. 2010); *State v. Floyd*, 125 Idaho 651, 654, 873 P.2d 905, 908 (Ct. App. 1994). In exercising self-defense, a person must exert only reasonable, and not excessive, force. *State v. Scroggins*, 91 Idaho 847, 849, 433 P.2d 117, 119 (1967). The degree of force used by Iverson was an issue in the case--with Iverson arguing his response was reasonable because, among other things, it was only one punch and the State countering that Iverson used excessive force "even in the context of one punch." The jury was instructed on this point. The photographs were probative in showing the degree of injury caused by the punch and supported the State's contention that Iverson used more force than was reasonable. Thus, the

photographs had clear probative value. Similarly, Iverson's contention that the photographs were unfairly prejudicial is unavailing. He argues the post-surgery photographs were "graphic" because they showed the surgical stitches and swelling. However, common sense dictates that a punch to the face resulting in the need for surgery would cause visible injuries, which, for the reason discussed above, was relevant to the jury's consideration of self-defense. Iverson has not shown the trial court committed reversible error in admitting the photographs.

## C. Discovery Violation

Iverson contends the trial court erred by allowing, over Iverson's objection, the State to present the testimony of Shawn and Dr. Farr and to introduce Darryl's medical records and photographs of Darryl's injuries because the late disclosure of this evidence deprived Iverson of due process by prejudicing his preparation of his defense. Due process demands an opportunity to be heard at a meaningful time and in a meaningful manner. *State v. Bettwieser*, 143 Idaho 582, 588, 149 P.3d 857, 863 (Ct. App. 2006). Thus, due process is violated if the defendant is not afforded a reasonable opportunity to meet the charges by way of defense or explanation. *Id*. It is a necessary corollary that in order to muster a defense, the defendant must have sufficient time to do so. *Id*. Where the late disclosure of evidence forms the basis of an alleged due process violation, the defendant must show the late disclosure to have been so prejudicial to the defendant's preparation of his or her case that a fair trial was denied. *State v. Tapia*, 127 Idaho 249, 255, 899 P.2d 959, 965 (1995); *State v. Barcella*, 135 Idaho 191, 199, 16 P.3d 288, 296 (Ct. App. 2000); *State v. Canelo*, 129 Idaho 386, 389, 924 P.2d 1230, 1233 (Ct. App. 1996). To prove prejudice, a defendant must show there is a reasonable probability that, but for the late disclosure, the result of the proceedings would have been different. *Tapia*, 127 Idaho at 255, 899 P.2d at 965; *Barcella*, 135 Idaho at 199, 16 P.3d at 296.

Iverson points out he requested any written or oral statements made to law enforcement, the prosecutor, or an agent of the prosecutor on August 17, 2011. The State's initial discovery response, filed on August 23, did not reference Shawn as a possible witness. It was not until October 11, after the pretrial conference and eight days before trial, that the State disclosed the possibility it would call Shawn to testify. Darryl's medical records were given to Iverson on October 17, and on October 18 the State disclosed the photographs of Darryl post-surgery and its intent to call Dr. Farr as a potential expert witness. On the day of trial, Iverson moved to exclude the evidence on the basis it had not been timely disclosed. The State countered it had turned

16

over the evidence to defense counsel as soon as it came into possession of it. The magistrate denied Iverson's motion in limine in regard to Shawn's testimony, the medical records, and the photographs, but limited Dr. Farr to testifying only as a custodian of the medical records and not as to his expert medical opinion relating to Darryl's injuries.[6] In making the latter decision, the magistrate noted that if Iverson had known ahead of time an expert witness was going to be called, he would have had the opportunity to obtain his own expert witness. On intermediate appeal, the district court determined the magistrate had not abused its discretion in admitting the evidence, noting the magistrate balanced several competing interests and "used what I consider to be a fairly deft hand in limiting what was introduced."

In arguing on appeal that the magistrate erred by allowing Shawn to testify at trial, Iverson contends that, had the State not been so tardy in disclosing Shawn as witness (and had it not "misrepresented" the nature of his testimony as discussed above), he could have prepared a more effective cross-examination.[7] Specifically, he argues he could have obtained Shawn's telephone records and "attempted to cast doubt on the veracity of [Shawn's] claim that the Appellant sent him a text message." We first note that, in regard to the alleged tardiness of the State's disclosure, Iverson did not inform the State he would be claiming self-defense until the pretrial conference on October 5. Thus, the State's disclosure of Shawn as a potential witness occurred less than a week after receipt of this information. However, even assuming the State was impermissibly tardy in disclosing Shawn as a possible witness, we are not convinced Iverson has shown a reasonable probability that, but for the late disclosure, the result of the proceedings would have been different. *Tapia*, 127 Idaho at 255, 899 P.2d at 965. Iverson was able to elicit from Shawn on cross-examination that the text messages had been inadvertently deleted and were unrecoverable, and that his only proof of the texts he testified to was his "word." The jury was aware Shawn was the victim's brother; thus, the jury was well within its ken to discount Shawn's testimony to the degree it found him unreliable. Iverson was also free to dispute that he sent the text messages--which he did not do during his testimony. Further, even had Iverson

---

[6]     Given the magistrate's ruling, the parties ended up stipulating to admission of the medical records and Dr. Farr did not testify.

[7]     In its brief on appeal, the State curiously does not address Iverson's contention regarding the propriety of allowing Shawn's testimony.

been able to somehow prove the text messages had not been sent, the key evidence taken from Shawn's testimony about the incident was Iverson's motivation in using force against Darryl.

In regard to disclosure of the State's intent to call Dr. Farr as a potential expert witness and disclosure of the medical records and photographs, Iverson contends had this information been timely disclosed, he would have had the "opportunity to contact an expert regarding whether or not the injuries did in fact occur as a result of the Appellant's punch" and "the opportunity to combat the State's claim that the extent of the complaining witness's injuries showed that the Appellant used excessive force in defending himself." Again, we note the fact that Iverson did not alert the State to his intent to pursue a self-defense justification until October 5. Even so, as noted above, the magistrate determined the evidence was not timely disclosed and explicitly limited Dr. Farr to testifying only as a custodian of the medical records and not as to his expert medical opinion relating to Darryl's injuries, recognizing that had the State disclosed its intent to present the expert witness earlier, Iverson could have obtained his own expert witness. Thus, Iverson's claim as to Dr. Farr's proposed testimony concerning anything beyond that pertaining to admission of the records is moot, as the magistrate did in fact exclude the substantive portion of his testimony. In regard to the magistrate's decision to allow Dr. Farr to testify as the custodian of the medical records, and to allow admission of the records themselves and the photographs, even if we assume their admission was erroneous, we are not convinced that but for the late disclosure, the result of the proceedings would have been different.[8] There was no evidence to suggest that any injuries Darryl suffered to his eye area were caused by anything other than Iverson's punch. In addition, Darryl himself testified as to his injuries--stating he sustained "four to five different fractures" requiring "three titanium plates . . . and 16 screws"; thus, such evidence was conveyed to the jury apart from the photographs and medical records (and Dr. Farr's proposed testimony as a custodian of those records). Iverson's right to due process was not infringed by the magistrate's refusal to exclude this evidence due to the State's late disclosure.

---

[8] We do not intend to imply that the disclosure of medical records and other evidence one day before trial, in a case where the victim's injuries were clearly relevant, is acceptable practice.

**D. Cumulative Error**

Finally, Iverson contends that even if the errors he alleges above are individually harmless, the cumulative error doctrine mandates reversal because he was deprived of the right to a fair trial. Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial. *Perry*, 150 Idaho at 230, 245 P.3d at 982; *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994). Here, we found one error--the prosecutor's statement at closing arguments that Iverson's use of force need have been his "only and best option." We also assumed two other errors--the magistrate's failure to conduct a Rule 403 balancing test and the admission of the medical records. We are not convinced the cumulation of these errors, which we found individually harmless, amounted to a deprivation of Iverson's right to a fair trial.

### III.

### CONCLUSION

Iverson has not shown the prosecutor's statements to the magistrate in aid of admitting certain evidence amounted to misconduct, let alone misconduct requiring reversal. Nor has Iverson shown the prosecutor committed misconduct in closing arguments by misstating the facts. Although the prosecutor did misstate the law by indicating the use of force must have been Iverson's "only and best option" in order to claim self-defense, the error was harmless. The magistrate did not commit reversible error by failing to perform a Rule 403 balancing test in respect to photographs of Darryl's injuries because the danger of unfair prejudice did not substantially outweigh their probative value. Nor was Iverson's right to due process violated by the magistrate's refusal to exclude certain evidence due to the State's untimely disclosure of the evidence. Finally, Iverson has not shown cumulative error requires a reversal of his conviction. The district court's intermediate appellate order affirming Iverson's judgment of conviction for battery is affirmed.

Judge LANSING and Judge MELANSON **CONCUR.**

19