IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 46102

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) Filed: November 7, 2019 |
| Plaintiff-Respondent, | ) |
| | ) Karel A. Lehrman, Clerk |
| v. | ) |
| | ) THIS IS AN UNPUBLISHED |
| TALENA LYNN HAMPTON, | ) OPINION AND SHALL NOT |
| | ) BE CITED AS AUTHORITY |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Hon. Michael P. Tribe, District Judge.

Judgment of conviction for aggravated assault with a deadly weapon, grand theft, and conspiracy to commit grand theft, affirmed.

Eric D. Fredericksen, State Appellate Public Defender; Jenny C. Swinford, Deputy Appellate Public Defender, Boise, for appellant. Jenny C. Swinford argued.

Hon. Lawrence G. Wasden, Attorney General; Jeffery D. Nye, Deputy Attorney General, Boise, for respondent. Jeffery D. Nye argued.

_____

BRAILSFORD, Judge

Talena Lynn Hampton timely appeals from her judgment of conviction entered after a jury found her guilty of aggravated assault with a deadly weapon, grand theft, and conspiracy to commit grand theft. Hampton asserts: (1) the State presented insufficient evidence to convict her of aggravated assault with a deadly weapon; (2) the district court abused its discretion by admitting evidence a third party posted bond for Hampton in two other counties; and (3) the district court committed reversible error by denying her motion for a mistrial. We affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2017, Hampton and Alexandria Arellano were staying with Kenneth White in White's trailer in Twin Falls. At the time, White's girlfriend was in jail. White asked multiple

1

people, including Hampton and Arellano, to co-sign with White or to find someone to co-sign to post bail for his girlfriend. Hampton had agreed to help, but only if White would pay a $100 overdue balance Hampton owed to a bail bond company for her previous misdemeanor bond. Although White could not find a willing bail bond company to post bail for his girlfriend, he managed to come up with $2,000 in cash gift cards and a few hundred dollars in cash for a possible bond.

On June 19, Hampton and Arellano went to Ivan Herrera's house to buy methamphetamine for White. While there, Hampton and Arellano talked to Herrera about bonding out White's girlfriend. Herrera said that he was related to a bondsman and that he would do Hampton a favor by bailing White's girlfriend out of jail. During this discussion, Hampton expressed her frustrations with White for pushing Hampton to find people to help White and for constantly being angry at Hampton for failing to find help. Further, both Hampton and Arellano disclosed to Herrera that they were upset with White, who had installed a hidden camera in the shower and recorded them without their knowledge.

After this discussion, Hampton testified that the conversation with Herrera concluded with Arellano proposing to take money from White; Herrera suggesting he use a gun to do so; and Hampton telling Herrera he did not need to use a gun:

> We had discussed--I said, made the comment, I feel like I'm whoring myself out, trying to find somebody to bond his girlfriend out for $100, that he's just leading me on and not paying, and dealing with all this crap, pretty much for him to pay $100 bond.
> And [Arellano] said: We should just take the money.
> And [Herrera] said: I'll do it. I'm a shooter, is what he said.

Hampton testified when Herrera stated, "I'm a shooter," he cocked a gun: "He pulled out a gun and was like cocking his gun back." Hampton further testified she responded, "Seriously dude? . . . . I told him that he was a little kid, immature, trying to make a name for himself, told him he didn't need a gun to do that, that he was just--he was acting immaturely." Afterwards, Hampton and Arellano took the drugs they had bought from Herrera for White and left.

Later that same night, Hampton told White that Herrera would be willing to help White bail out his girlfriend. White insisted Herrera help him that night, so Hampton called Herrera and he told them to meet him downtown at the old Treatment and Recovery Clinic (TARC) building to settle the bond and that the bond would cost $2,000. White drove in his truck, and Hampton and Arellano drove together in a separate car. When they got to the TARC building,

Hampton and Arellano spoke with Herrera before he met White. According to Hampton, she knew Herrera had a gun in the car before introducing White to Herrera:

> Q.    Okay. Did you see [Herrera]'s gun at that point?
> A.    I saw him--yes, he had it in the middle.
> Q.    In the middle?
> A.    In the middle console, like it was sitting on the middle console, and he had blue gloves on. And I told him: What are you doing?
>       And also in my interview, I went and I had said to [Arellano]: He's got a gun. Let's go. He's got a gun. Let's go.
>       That's whenever [Herrera] said: Don't try anything, said not to be a pussy.

After seeing Herrera with a gun, Hampton told White to "come on over," and Herrera introduced himself to White as "Eric." White testified Herrera told White that he needed to first take a urinalysis test and to fill out some paperwork and that the bond would cost $2,200 instead of $2,000. White gave Herrera the cash gift cards and $200 in cash, and then White followed Herrera around the side of the building. Hampton and Arellano followed behind White. White testified that as soon as they reached the back of the building, Herrera spun around, pointed a gun at White and said, "Get the fuck out of [here]." White was shocked. He turned, walked back to his truck, and drove home.

Arellano and Hampton left at the same time as White and drove back to White's trailer. After about a half hour, Hampton and Arellano left White's trailer and met Herrera at a motel. Hampton drove Herrera to a store where he used some of the gift cards he had taken from White to buy an iPhone. Herrera gave the remaining gift cards to Arellano, who used one to rent a motel room. While Hampton was in the motel room with Arellano, the front desk called and warned Hampton not to go out to her car. Hampton testified that she had methamphetamine in the motel room and that she assumed the police intended to arrest her for misdemeanor warrants. In fact, a bondsman from the bail bond company, not the police, had arrived at the motel looking for Hampton. The bondsman's arrival prompted Hampton to grab the motel room keys, credit cards, and one of the gift cards and to run out of the motel room because she thought the police had arrived, and she did not want to get arrested for drug possession.

Hampton claims she did not know where to go when she ran from the motel room, and on the "spur of the moment" she decided to go to Herrera's house. While Hampton was at Herrera's, the bondsman arrived and took Hampton into custody. While in custody, Hampton gave the bondsman a gift card which Herrera had stolen from White. As a result of Hampton's

3

involvement in Herrera's encounter with White, the State charged Hampton with aggravated assault with a deadly weapon, grand theft and conspiracy to commit grand theft. A jury found Hampton guilty, and she timely appeals.

## II.

## ANALYSIS

### A. The State Presented Sufficient Evidence for a Jury to Properly Convict Hampton of Aggravated Assault

Hampton contends the State did not present sufficient evidence to convict her of aggravated assault with a deadly weapon. Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

The district court denied Hampton's motion for judgment of acquittal on the charge of aggravated assault with a deadly weapon. The district court instructed the jury that to prove Hampton aided and abetted Herrera in committing aggravated assault, the State had to prove beyond a reasonable doubt that "Hampton aided and abetted [Herrera], who committed an assault upon [White] by pointing a gun at [White], and [Hampton] committed that assault with a deadly weapon." The district court further instructed the jury that "an assault is committed when a person . . . intentionally and unlawfully threatens, by word or act, to do violence to the person of another, with an apparent ability to do so, and does some act which creates a well-founded fear in the other person that such violence is imminent," and that "a deadly weapon is one likely to produce death or great bodily harm."

Aiders and abettors are culpable as principals in felony cases. *See* Idaho Code § 19-1430; I.C. § 18-204; *State v. Johnson*, 145 Idaho 970, 973, 188 P.3d 912, 915 (2008). "To aid and abet means to assist, facilitate, promote, encourage, counsel, solicit or incite the commission of a

4

crime." *State v. Smith*, 161 Idaho 782, 787, 391 P.3d 1252, 1257 (2017) (quoting *Howard v. Felton*, 85 Idaho 286, 297, 379 P.2d 414, 421 (1963)) (internal quotation omitted). To be tried as a principal of aggravated assault with a deadly weapon, Hampton must have "knowingly participated by any of such means in bringing about the commission of a crime." *Smith*, 161 Idaho at 787, 391 P.3d at 1257 (quoting *Felton*, 85 Idaho at 297, 379 P.2d at 421). "The mental state required is generally the same as that required for the underlying offense--the aider and abettor must share the criminal intent of the principal and there must be a community of purpose in the unlawful undertaking." *State v. Romero-Garcia*, 139 Idaho 199, 204, 75 P.3d 1209, 1214 (Ct. App. 2003).

Hampton argues the evidence only proved, at best, that she had knowledge Herrera had a gun, but it did not show Hampton shared Herrera's criminal intent to intentionally and unlawfully threaten White with a gun. Hampton claims that the evidence shows she advised Herrera against using the gun, which negated Hampton's intent, and that no evidence showed she encouraged, assisted, or solicited Herrera to bring or use a gun.

Hampton's own testimony, however, provided sufficient evidence she was guilty of the crime. Hampton testified that: (1) she was very angry at White for recording Arellano and Hampton in the shower; (2) she participated in a conversation in which Herrera stated he was a shooter while cocking his gun after a statement was made about taking White's money; (3) Hampton led White to Herrera by telling White that Hampton had found someone to post bond for White's girlfriend; (4) Hampton saw Herrera had brought his gun to the meeting; (5) Hampton introduced White to Herrera while knowing Herrera was in possession of a gun; (6) Hampton gave Herrera a ride to a store after the assault so he could use the stolen gift cards to buy an iPhone; (7) Hampton stayed in the motel room that Arellano paid for with one of the stolen gift cards; and (8) Hampton gave one of the stolen gift cards to the bondsman. This substantial evidence shows Hampton not only knew that Herrera planned to use his gun to take White's money, but Hampton continued to participate in furtherance of the crime. *Cf. Rosemond v. United States*, 572 U.S. 65, 67 (2014) (concluding proof of aiding and abetting requires proof that "the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission").

Viewed in the light most favorable to the State, the State presented substantial evidence upon which a reasonable trier of fact could have found Hampton guilty of aggravated assault with a deadly weapon. Hampton had advance knowledge Herrera would most likely bring a gun to the meeting at the TARC building based on the conversation between Hampton, Arellano, and Herrera at Herrera's house. Further, Hampton saw Herrera had a gun with him in the car and told White to "come on over" anyway. After the assault, Hampton met up with Herrera and drove him to a store so he could use the stolen gift cards. Based on these facts, Hampton had more than mere knowledge and took specific actions to aid Herrera's assault against White with a deadly weapon, and the State proved the essential elements of aggravated assault with a deadly weapon beyond a reasonable doubt.

**B.** **While the District Court Erred in Admitting the Bondsman's Statement, the Error Was Harmless**

Hampton contends the district court abused its discretion by admitting the bondsman's testimony that his supervisor had more interactions with Hampton through the supervisor's dealings with Hampton's previous bonds in other counties. Hampton objected to the testimony as irrelevant but the district court overruled the objection and admitted the testimony to prove identity:[1]

| | |
|---|---|
| Prosecutor: | Leading up to the incident in June, how many personal interactions had you had with [Hampton]? |
| Bondsman: | Very limited, probably two to three interactions. My supervisor . . . also had more interactions with [Hampton] than I did, posting bonds for her on behalf in Ada and Elmore Counties. |
| Defense: | Objection, Your Honor, the *relevancy* of these other counties. |
| The Court: | Well, doesn't this go to *identification*? Isn't that what we're talking about? |
| Prosecutor: | Yeah. |
| The Court: | I'll overrule that. |

---

[1] Originally in her opening brief, Hampton claimed the district court erred by admitting the statement under Rule 404(b) of the Idaho Rules of Evidence to establish identity. In response, the State argued Hampton waived the issue by failing to object under Rule 404(b), relying on *State v. Cannady*, 137 Idaho 67, 72, 44 P.3d 1122, 1127 (2002). At oral argument, however, Hampton conceded the district court likely was referring to Hampton's identity in the courtroom, not her identity when committing the crime. Regardless, Hampton did not waive the issue. *See State v. Avila*, 137 Idaho 410, 412, 49 P.3d 1260, 1262 (Ct. App. 2002) ("Rule 404(b) is a relevance rule, and a Rule 404(b) objection is but a particular type of relevance objection. . . . Thus, when a question of admissibility of evidence under Rule 404(b) is examined, the initial inquiry is whether the evidence *is relevant* for a purpose other than proving character and conduct in conformity with that character.").

The State concedes the district court admitted this testimony in error but argues the error was harmless. Error is not reversible unless it is prejudicial. *State v. Stoddard*, 105 Idaho 169, 171, 667 P.2d 272, 274 (Ct. App. 1983). Thus, we examine whether the alleged error complained of in the present case was harmless. *See State v. Lopez*, 141 Idaho 575, 578, 114 P.3d 133, 136 (Ct. App. 2005). Where a defendant meets the initial burden of showing an error has occurred, the State has the burden of demonstrating to the appellate court beyond a reasonable doubt that the violation did not contribute to the jury's verdict. *State v. Perry*, 150 Idaho 209, 227-28, 245 P.3d 961, 979-80 (2010). In other words, the error is harmless if the Court finds the result would have been the same without the error. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017).

The State argues the bondsman's testimony about bonds was harmless for two reasons. First, the State claims the bondsman's testimony was repetitive of other testimony presented without objection before and after the statement was made, thus making the error harmless. *See State v. Capone*, 164 Idaho 118, 125, 426 P.3d 469, 476 (2018) (concluding error was harmless because testimony was admitted without objection through other witnesses). Second, the State claims the error was harmless because the State presented overwhelming evidence of Hampton's guilt.[2] Hampton disputes that the error was harmless. Hampton argues the other witnesses' statements about her bonds (including her testimony) and her defense counsel's opening statement, were more vague and far less prejudicial in comparison to the bondsman's reference to Hampton's two other past criminal offenses in two separate counties.

---

[2] Hampton contends the State relies on an incorrect standard of review for harmless error by arguing "overwhelming evidence" supports Hampton's conviction of guilt. Idaho appellate courts, however, have considered overwhelming evidence of guilt as a factor in the harmless error analysis. *See, e.g.*, *State v. Montgomery*, 163 Idaho 40, 44, 408 P.3d 38, 46 (2017) ("Based on the overwhelming evidence presented against [the defendant] at trial, we are convinced beyond a reasonable doubt that the jury's verdict would have been the same even without the officer's testimony."); *State v. Stell*, 162 Idaho 827, 830-31, 405 P.3d 612, 615-16 (Ct. App. 2017) ("Based on the evidence presented, we are convinced beyond a reasonable doubt that playing the audio recording for the jury . . . did not contribute to the verdict. The jury was provided with overwhelming evidence . . . . Therefore, any errors in the admission of the [evidence] were harmless."); *State v. Watkins*, 152 Idaho 764, 769, 274 P.3d 1279, 1284 (Ct. App. 2012) ("Considering the overwhelming evidence of guilt presented at trial . . . we are convinced beyond a reasonable doubt that the [disclosures] were harmless in this case.").

7

We hold that admitting the bondsman's testimony about Hampton's bonds was harmless because similar testimony was admitted without objection. This repetitive testimony included: White's testimony, without objection, that the bail bond company was looking for Hampton "[b]ecause she had a warrant or something from some other county"; the bondsman's testimony, without objection, that Hampton "was one of [the bail bond company's] clients that failed to appear on us and we had to bring her back"; and finally, Hampton's own testimony that the bail bond company had bonded her out, she "didn't want to go back to jail," she "just had bonded out of jail," and she agreed to help White bond out his girlfriend if White agreed to pay Hampton's outstanding bond debt. Similarly, the opening statement of Hampton's defense counsel previewed that the bondsman would testify Hampton had bonds outside of Twin Falls County. Specifically, defense counsel stated: "They say, we have a lot of warrants out of Elmore County, a lot of felony warrants out of Elmore County. They go after [Hampton]. There are no warrants, except maybe a battery one, out of Elmore County."[3]

We disagree with Hampton's assertion that these statements were "more vague" and "less prejudicial" than the bondsman's brief testimony about Hampton's bonds in other counties. Furthermore, overwhelming evidence, including Hampton's own testimony outlined above, establishes beyond a reasonable doubt that the jury reached its guilty verdict independent of the bondsman's testimony about Hampton's bonds in other counties. *See State v. Herrera*, 164 Idaho 261, 273, 429 P.3d 149, 161 (2018) (concluding "the admission of [inadmissible testimony] was harmless based on the overwhelming evidence that [the defendant] shot [the victim]").

## C. The District Court Did Not Commit Reversible Error by Denying Hampton's Motion for a Mistrial

Hampton contends the district court erred by denying her motion for a mistrial. In criminal cases, motions for mistrial are governed by Idaho Criminal Rule 29.1. A mistrial may be declared upon motion of the defendant when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the

---

[3] Hampton argues the State cannot rely on her counsel's opening statement to evaluate whether the error was harmless because the district court instructed the jury that counsel's statements were not evidence. Hampton, however, does not cite any authority for this proposition and, therefore, waived the argument. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996) (ruling party waives issues on appeal if authority is lacking).

defendant and deprives the defendant of a fair trial. I.C.R. 29.1(a). Our standard for reviewing a district court's denial of a motion for mistrial is well-established:

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983).[4]

The subject of Hampton's mistrial motion is testimony about Hampton's outstanding warrants in four other counties and about her methamphetamine purchase. On direct examination, the bondsman testified that "[Hampton] was out on bond with us, and she had warrants out of Ada, Elmore, Jerome, and Twin, so we figured Elmore would be the best central location for everything to be served on her and to get off her bond there." After the State asked the bondsman three more questions, Hampton moved for a mistrial arguing that the testimony was "almost tantamount to saying that there are other convictions in other counties" and that it had the same prejudicial effect as the bondsman's earlier testimony about other bonds. The district court denied Hampton's motion. Then, Officer Rivers testified that Hampton "had purchased some methamphetamine" when explaining why Hampton, Arellano, and Herrera had initially met on the day of the assault. Hampton immediately objected and again moved for a mistrial. The district court sustained the objection, but reaffirmed its denial of the motion for a mistrial after the close of evidence.

Hampton argues the testimony about her warrants and methamphetamine purchase was irrelevant, unduly prejudicial, and improper character and propensity evidence in violation of

---

[4] Hampton incorrectly asserts the State has the burden to prove harmlessness under the reversible error standard. Under the burden articulated in *Urquhart*, the defendant must establish the prejudicial evidence likely had a continuing impact on the trial and ultimately deprived the defendant of the right to a fair trial. Establishing prejudice is part of establishing error; once prejudice is established, there is no burden of proof to shift to the State. Thus, in this case, if Hampton establishes the inadmissible evidence had a continuing impact on the trial that rises to the level of a deprivation of her right to a fair trial, there is nothing left (in terms of prejudice) for the State to establish. Conversely, if Hampton fails to show prejudice, the challenged error is harmless and the district court did not err in denying the mistrial motion.

Rule 404(b). She contends that the testimony about her warrants persuaded the jury she was guilty because she had apparently committed a string of crimes and was wanted all over the state, and that "the jury could not have turned a blind eye" after hearing about her methamphetamine purchase, notwithstanding that the district court sustained her objection. The State does not dispute the challenged testimony was irrelevant and prejudicial. Instead, the State asserts this evidence was harmless based on other evidence the State admitted without Hampton's objection and to which Hampton herself testified.

The challenged testimony regarding Hampton's warrants and drug purchase had little impact on the jury in light of all the other unobjected-to, admitted evidence regarding the same subject matters. Twice before the bondsman testified about Hampton's previous warrants, witnesses testified about the same subject matter without Hampton's objection. First, White testified that the bail bond company was looking for Hampton "[b]ecause she had a warrant or something from some other county." Next, the bondsman testified that "[Hampton] was one of [the bail bond company's] clients [who] failed to appear on us and we had to bring her back." Hampton did not timely object to this testimony; did not ask that the testimony be stricken; did not request a limiting or curative instruction of any kind; and remained silent when the district court asked for advice, guidance, or suggestions from counsel about a possible limiting instruction for the jury. Then, Hampton testified about her warrants multiple times, including that "[Officer Rivers] said . . . There's a warrant out for [me]"; "I had misdemeanor warrants"; and "I had told [Herrera] I had warrants [and] I didn't want to go to [the] Shoshone courthouse."

Likewise, Hampton repeatedly testified regarding her drug purchases and use including that: "I was using, and I met [Herrera], it was through getting or exchanging drugs was how [we met], to be honest"; "[W]e were going to buy drugs for [White]--part of the money that [White] had, he wanted us to purchase drugs for him"; "After we got the drugs, we were going to take it back to [White]"; "We showed up at [White's], used drugs together . . ."; and "Well, I had drugs in the [motel] room, that's what I thought it was about . . . I assumed it was about the drugs."

Although Hampton acknowledges she later testified about her warrants and drug purchases and use, she contends she did so "to defuse the impact" of the evidence and that her testimony was not a waiver of her earlier objections. In support, Hampton cites *State v. Guinn*, 114 Idaho 30, 752 P.2d 632 (Ct. App. 1988). In *Guinn*, the defendant was charged with manufacturing a controlled substance. *Id.* at 32, 752 P.2d at 634. On cross-examination, a State

10

witness refused to reveal an "acquaintance" who prompted the witness to report the defendant. *Id.* at 33, 752 P.2d at 635. Defense counsel moved to compel the witness to answer, and the district court denied the motion. *Id.* On redirect, the prosecuting attorney asked the witness to respond, and the district court allowed the testimony. *Id.* In response, the witness testified the acquaintance feared repercussions from the defendant. *Id.* The district court asked for clarification for foundation purposes, and the witness testified: "I . . . believe[d] [repercussions] would happen because [the defendant] is a convicted felon and has spent time in the penitentiary." *Id.* at 33, 752 P.2d at 635. The defendant immediately objected and moved for a mistrial. *Id.* The district court denied the motion. *Id.* The defendant later testified he had committed crimes in the past, but explained they had occurred after his father's untimely death. *Id.* at 34, 752 P.3d at 636. The defendant was found guilty. *Id.*

On appeal from the denial of the motion for mistrial in *Guinn*, the State asserted any error was harmless because defense counsel prompted the testimony, and the defendant later testified about his felonies. *Id.* at 34, 752 P.2d at 636. This Court disagreed, noting that "it was the court's attempt to clarify the foundation of the witness's testimony--*not* defense counsel's brief, aborted inquiry--that led to the witness's statement." *Id.* at 34, 752 P.2d at 636. Further, the Court concluded the defendant's later testimony concerning his criminal record--which did not include any mention of imprisonment--was an attempt to defuse the testimony's impact and was not a waiver of the earlier objection. *Id.* The Court concluded the error was not harmless, ruling: "If the evidence of [the defendant's] prior record had been excluded, we are not prepared to declare beyond a reasonable doubt that the jury would have arrived at the same verdict of felonious possession of marijuana, based on the remaining evidence." *Id.*

This case is distinguishable from *Guinn* for numerous reasons. First, Hampton's counsel, not the court, introduced the subject of Hampton's warrants to the jury in opening, which was the only mention of felony warrants. Second, the district court sustained Hampton's objection to Officer River's testimony about Hampton's drug purchase. Yet, Hampton repeatedly testified on direct examination about her drug purchase and use. Finally, the manner in which Hampton testified about her warrants and drug use establishes she was not trying to defuse prior inadmissible testimony. Hampton's testimony about drugs and warrants was not narrowly tailored to respond to the testimony that was the subject of her mistrial motion. Rather,

11

Hampton's testimony was more generally an effort to explain her conduct at the time of the crime.

Based on the totality of the evidence presented at trial, the testimony about Hampton's warrants and methamphetamine purchase did not affect the jury's verdict. *See, e.g.*, *State v. Barcella*, 135 Idaho 191, 199, 16 P.3d 288, 296 (Ct. App. 2000) ("Given the totality of admissible evidence, and when viewed in context of the full record, [the witness's] blurt did not contribute to [the defendant's] conviction"). Consequently, the district court did not commit reversible error by denying Hampton's motion for a mistrial.

## III.

## CONCLUSION

The State presented sufficient evidence for the jury to convict Hampton of aggravated assault. Although the district court erred in admitting the bondsman's statement regarding Hampton's prior bonds, the error was harmless. Additionally, the district court did not commit reversible error in refusing to grant Hampton's motion for a mistrial after the bondsman testified regarding Hampton's outstanding warrants and Officer Rivers referenced Hampton's drug purchase. Accordingly, Hampton's judgment of conviction for aggravated assault with a deadly weapon, grand theft, and conspiracy to commit grand theft is affirmed.

Judge HUSKEY and Judge LORELLO **CONCUR**.